SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

INVESTMENT BANKERS OF AMERICA, INC., Defendant.

Civ. A. No. 378–60.

United States District Court
District of Columbia.

Feb. 25, 1960.

tion to restrain the defendant corporation, a registered broker-dealer, from operating its over-the-counter securities business.[1] The motion is based on the S. E. C.'s contention that the defendant has violated Rule 15c3–1 (17 C.F.R. 240, 15c3–1), promulgated under the Securities Exchange Act of 1934, by not satisfying the rule's capital requirement standard. More specifically, the Commission contends that the defendant has allowed its "aggregate indebtedness" to exceed 2,000 per centum of its "net capital", and thus asks the Court to restrain the defendant for so long as the defendant fails to meet the rule's requirement of a twenty-to-one ratio between "aggregate indebtedness" and "net capital".[2]

The Commission submitted an affidavit of one of its investigators, George E. Haine, who conducted an investigation of the defendant's books on February 2 through 5, 1960. This affidavit sets forth Haine's computations under 15c3–1 and shows that the defendant had a net capital deficiency of $322,925.79; that is to say, this amount was required in order to bring the defendant's aggregate indebtedness down to 2,000 per centum of the defendant's net capital and thus into compliance with Rule 15c3–1.

The Court has heard oral argument and taken testimony so as to be able to base its decision on the "series of estimates" involved on a motion for a preliminary injunction: "the relative importance of the rights asserted and the acts sought to be enjoined, the irreparable nature of the injury allegedly flowing from denial of preliminary relief, the probability of the ultimate success

Thomas S. Sullivan, W. J. Crow, Washington, D. C., for plaintiff.

Joseph A. Fanelli, Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

The Securities and Exchange Commission has moved for a preliminary injunc-

---

1. More accurately, the plaintiff asks the Court to enjoin the defendant from making "use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange, in contravention of such rules

and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors to provide safeguards with respect to the financial responsibility of brokers and dealers." Sec. 15(c) (3) of the Securities and Exchange Act of 1934, 15 U.S.C.A. § 78o(c) (3).

2. "Aggregate indebtedness" and "net capital" are defined in Rule 15c3–1(c), 17 C.F.R. 240.15c3–1(c).

or failure of the suit, the balancing of damage and convenience generally." [3]

The principal dispute concerns the propriety of including in the aggregate indebtedness figure an amount to reflect the liability due certain members of the investing public as the result of the following transaction. About December 10, 1959, under a "Selected Dealers Agreement", the defendant contracted with N. Pinsker and Company and Smith Holly and Company, two New York brokerage houses, for the sale by them of Sip'n Snack Shoppes, Inc. stock totalling 175,000 shares. The defendant had previously agreed to underwrite the stock for Sip'n Snack Shoppes, Inc. on a "best-efforts" basis. Defendant has received the proceeds (after deduction of the New York houses' commission) for the sale of 67,410 shares. The balance, representing the receipts for 107,590 shares has not been remitted. The New York houses were heavily invested in Oreclone Concentrating Corporation common and when the market price of this stock broke sharply on January 15, 1960, the houses refused delivery and payment of Oreclone stock bought by them. They were immediately enjoined and placed in receivership and thus could not consummate their other transactions.

The Commission contends, and two of its agents testified, that these 107,590 shares of Sip'n Snack were sold to the public by the two New York houses but that the shares were not delivered. Therefore, contends the Commission, the defendant has a liability to the investors to make good on these shares since the New York houses were the sub-agents of the defendant. The defendant contends that there was no agency relationship but rather an outright sale to the New York houses, and thus there is no liability on its (the defendant's) part to the investors.

After careful consideration of the documents on file and a review of the applicable authorities, the Court is of the opinion that there is a sufficient likelihood of the plaintiff's proving at a trial that an agency relationship actually existed so as to warrant the Court in issuing the requested preliminary injunction.[4] Moreover, even if the defendant's position were accepted and the Pinsker-Smith Holly transaction completely disregarded for purposes of the Rule 15c3–1 computation, there would still be a capital deficiency of some $21,000, in all likelihood. This amount is not insignificant in relation to the defendant's working capital—excluding the Sip'n Snack transaction—of about $4,200.

The motion for a preliminary injunction is granted. Counsel for the plaintiff is requested to prepare findings of fact, conclusions of law and judgment in conformity with this memorandum.

3. Communist Party of United States of America v. McGrath, D.C.D.C.1951, 96 F. Supp. 47, 48 (concurring opinion of Bazelon, J.). See also, 7 Moore's Federal Practice para. 65.04(2).

4. If the New York houses were the agents of the defendant, then clearly the defendant would be liable for its agents' breach of contract. Furthermore, it seems clear that regardless of the defendant-New York houses' relationship, the defendant was the agent of Sip'n Snack Shoppes, Inc. and thus has a liability outstanding to Sip'n Snack for stock received but not paid for. The "best-efforts underwriting" method of selling stock has been described as follows: "Companies which are not well established are not apt to find an underwriter who will give a firm commitment and assume the risk of distribution. Of necessity, therefore, they customarily distribute their securities through firms which merely undertake to use their best efforts. The securities house, instead of *buying* the issue *from* the company and reselling it as principal, *sells* it *for* the company as agent; and its compensation takes the form of an agent's commission rather than a merchant's or dealer's profit. There may still be a selling group to help in the merchandising. But its members likewise do not buy from the issuer; they are sub-agents. This, of course, is not really underwriting; it is simply merchandising." Loss, "Securities Regulation" (1951 ed.), 115–116.