ESTATE OF MARCELLUS L. JOSLYN, ROBERT D. MACDONALD, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5591-67. Filed January 28, 1975.

---

*Malcolm George Smith,* for the petitioner.
*Allan D. Teplinsky* and *Norman H. McNeil,* for the respondent.

SUPPLEMENTAL FINDINGS OF FACT AND OPINION

SIMPSON, *Judge:* This case is now before the Court on remand from the United States Court of Appeals for the Ninth Circuit. The case was originally heard by this Court and decided in favor of the Commissioner (57 T.C. 722 (1972)). Upon a petition for review, the Court of Appeals for the Ninth Circuit reversed our decision and remanded the case for further consideration in accordance with its opinion (500 F. 2d 382 (1974)).

The parties having jointly moved to reconsider this case on the basis of the evidence in the record and briefs previously filed, no further hearing was held. The Court of Appeals ruled that we erred in holding that the selling expenses incurred in the secondary offering were not a deductible cost of administration under section 2053 of the Internal Revenue Code of 1954[1] because such selling expenses were taken into consideration in computing the value of the stock includable in the gross estate. The case was remanded so that we might consider "whether the particular deductions claimed are within the purview of section 2053 and, if so, what is the extent of those deductions."[2] 500 F. 2d at 387.

FINDINGS OF FACT

Some of the supplemental facts have been stipulated, and those facts are so found.

On the date of his death, the decedent owned 66,099 shares of common stock in Joslyn Mfg. & Supply Co. (Joslyn). The stock was not then listed on any national exchange but was traded over the counter. In order to pay the estate's taxes and administration costs, a portion of the Joslyn stock was selected for sale by the petitioner.

---

[1] All statutory references are to the Internal Revenue Code of 1954.

[2] The legal expenses of this litigation are to be considered in a computation pursuant to Rule 155, Tax Court Rules of Practice and Procedure.

Due to the size of the petitioner's block of stock, it was decided that the best method of selling the stock was by registering it and selling it by means of a secondary offering. Negotiations were begun with the stock brokerage firm of Hornblower & Weeks-Hemphill, Noyes (Hornblower) during the summer of 1964 to arrange the sale.

On September 30, 1964, all the stock of Joslyn was split at the ratio of 4 to 1. After the split, the petitioner owned 264,396 shares of the stock. The process of registering the stock with the Securities and Exchange Commission (SEC) was thereupon commenced. The stock could not be publicly sold until the registration became effective.

After the filing of the registration statement with the SEC, Hornblower sought other firms to participate in underwriting the sale of the Joslyn stock. It sought firms which had selling organizations oriented toward a wide distribution of the stock to the public.

On March 30, 1965, the registration became effective. Thereupon, the petitioner[3] entered a firm commitment underwriting agreement with Hornblower who was acting as representative for 42 other underwriters. The agreement provided that the petitioner would sell 250,000 shares of Joslyn stock, and each underwriter would purchase its proportionate part, for $18.095 per share. The petitioner warranted its title to the stock free and clear of all liens so that delivery of the stock to the underwriters would vest title in them. The closing date on which payment to the petitioner was to be made in full by certified check was the sixth full business day after the effective date of the registration. The petitioner was to reimburse Joslyn for any expenses incurred in connection with the registration and to provide indemnification insurance for the underwriters.

The obligation of the underwriters was made conditional on the stock remaining registered until the date for payment; on receiving various specified legal and accounting opinions and certifications; and on the following clause:

(i) Since the date of this Agreement and prior to the Closing Date there shall not have occurred any substantial change in affairs which, in the opinion of the Underwriters (including the Representative) who have agreed to purchase in the aggregate 50% or more of the Shares, has had such an effect on the financial

---

[3] Trustees of an unrelated trust were also parties to the agreement as selling shareholders.

markets of the United States as to render it impractical or inadvisable to consummate the sale of the Shares at the price herein provided.

The underwriting group sold the Joslyn stock to the public for $19.25 per share. Within a short period from March 30, 1965, the stock had been sold at retail to the public in 2,391 separate sales by members of the underwriting group and certain dealers.

On April 6, 1965, pursuant to the terms of the underwriting agreement, the underwriters delivered checks for $4,523,750 ($18.095 per share) to the petitioner, and the petitioner in turn delivered 250,000 shares of Joslyn stock to the underwriters.

The petitioner incurred and paid the following expenses in connection with the sale of the Joslyn stock:

| | |
|---|---:|
| Travel expense | $489.52 |
| Bond premium for underwriters | 13,679.09 |
| Attorneys for underwriters | 6,860.35 |
| Reimbursement to Joslyn | 47,447.96 |
| Costs of Kindel & Anderson | 1,726.77 |
| Total | 70,203.69 |

These expenses and fees were approved by the California probate court with jurisdiction over the decedent's estate.

In this proceeding, the petitioner seeks to deduct as administration expenses the incidental expenses of the underwriting, consisting of $70,203.69, and the underwriting discount, consisting of the difference between the price it received for the stock and the price paid by the public, or $288,750. The Commissioner denied a deduction for these amounts.

#### OPINION

We must decide whether the incidental expenses and underwriting discount are deductible under section 2053(a)(2) which allows a deduction for administration expenses in computing a taxable estate. Section 20.2053-3(d)(2) of the Estate Tax Regulations provides:

(2) Expenses for selling property of the estate are deductible if the sale is necessary in order to pay the decedent's debts, expenses of administration, or taxes, to preserve the estate, or to effect distribution. The phrase "expenses for selling property" includes brokerage fees and other expenses attending the sale, such as the fees of an auctioneer if it is reasonably necessary to employ one. Where an item included in the gross estate is disposed of in a bona fide sale (including a redemption) to a dealer in such items at a price below its fair market value, for purposes of this paragraph there shall be treated as an expense for selling the item whichever of the following amounts is the lesser: (i) The

amount by which the fair market value of the property on the applicable valuation date exceeds the proceeds of the sale, or (ii) the amount by which the fair market value of the property on the date of the sale exceeds the proceeds of the sale. * * * See §§ 20.2031-1 through 20.2031-9.

The Commissioner agrees that the sale of the Joslyn stock was necessary to pay the expenses of administration and taxes. See *Estate of David Smith,* 57 T.C. 650 (1972), on appeal (C.A. 2, Apr. 25, 1974); *Estate of Mabel F. Colton Park,* 57 T.C. 705 (1972), revd. 475 F. 2d 673 (C.A. 6, 1973). However, he argues that the third sentence of the above-quoted regulation is a limitation on the deduction allowed by the first two sentences. According to that interpretation of the regulation, the expenses for the sale of the Joslyn stock are not deductible because the fair market value of the stock on the applicable valuation date did not exceed the proceeds of the sale. There may be a question as to whether the stock was sold to "dealers" within the meaning of the regulations, but we need not decide that question, for we are convinced that the Commissioner's proposed interpretation of the regulations is completely unwarranted.

The disputed provision of the regulations does not purport to be a limitation on the deduction authorized by the first two sentences of the paragraph. It provides that the lesser of the two amounts "shall be treated as *an* expense for selling the item [emphasis supplied]," not the *only* expense allowed. The sentence in question merely allows an additional deduction to the estate if it suffers a loss on the sale of an item. It does not purport to deny or limit a deduction for other expenses incurred when a sale to a dealer is made.

A review of the history of this regulation provides additional support for our view of the regulations. Since the early days of the estate tax, the regulations have consistently allowed a deduction for brokerage fees and other reasonable expenses connected with the sale if necessary for the administration of the estate.[4] The sentence concerning a sale to a dealer was not added until 1965; it was not added as a result of any new statutory limitation. The new sentence was added to section 20.2053-3(d)(2) at the same time as the amendment of sections 20.2031-1 through 20.2031-9, relating to the valuation of property included

---

[4] The provision first appeared in 1919 in art. 44, Regs. 37. It was reiterated in similar language in 1942 in sec. 81.35, Regs. 105, and in 1958 in sec. 20.2053-3(d), Estate Tax Regs.

in an estate, and it is apparent that the amendment of section 20.2053-3(d)(2), allowing a deduction for a sale at a loss, was a corollary of the adoption of new rules for the valuation of property included in the estate. See T.D. 6826, 1965-2 C.B. 368-369. Accordingly, we hold that the third sentence of section 20.2053-3(d)(2) does not affect the deductibility of the incidental expenses for the sale of the Joslyn stock. In view of that conclusion, we need not consider the petitioner's alternative argument that the amended regulation could not retroactively apply in this case.

The incidental expenses incurred by the estate in connection with the sale of the stock are clearly expenses of selling property. Furthermore, they were allowed as expenses of administration by the California probate court which had jurisdiction over the estate. See *Estate of Louis Sternberger*, 18 T.C. 836 (1952), affirmed per curiam 207 F. 2d 600 (C.A. 2, 1953), reversed on other issues 348 U.S. 187 (1955). Consequently, they are deductible under section 2053(a)(2) as administration expenses.

The petitioner also claims that the underwriting discount is deductible as a brokerage fee. It contends that the underwriting agreement, while in form a contract of sale, was in substance a brokerage agreement. However, we find that the substance of the agreement, as well as the form, was a sale by the estate to the underwriters.

The underwriting agreement was by its terms a sale. The underwriters agreed to pay for the stock regardless of whether they were able to sell any of it to the public.[5] This form of agreement is known as "firm commitment" underwriting.

It is not technically underwriting in the classic insurance sense. But its purpose and effect are much the same in that it assures the issuer of a specified amount of money at a certain time (subject frequently to specified conditions precedent in the underwriting contract) and shifts the risk of the market (at least in part) to the investment bankers. The issuer simply sells the entire issue outright to a group of securities firms, represented by one or several "managers" or "principal underwriters" or "representatives." They in turn sell at a price differential to a larger "selling group" of dealers. And they sell at another differential to the public. In a very limited sense the process is comparable to the merchandising of

---

[5] The petitioner offered proof to show that all the stock was sold by the underwriters prior to the closing date. We need not pass on the Commissioner's objection to such evidence, for we find it not determinative in this case. In our view, the fact that the underwriters' obligations were not conditional upon their ability to sell all of the stock is the controlling factor. The fact that all of it may have been sold does not prove that the underwriters were mere brokers.

beans or automobiles or baby rattles. The issuer is the manufacturer of the securities; the members of the underwriting group are the wholesalers; and the members of the selling group are the retailers. * * * [1 Loss, Securities Regulation 164 (2d ed. 1961).]

There was no evidence that the underwriting agreement was other than a bona fide sale to the underwriters; they were acting as principals and were not mere agents for the estate. Compare *Demarco v. Edens,* 390 F. 2d 836, 844 (C.A. 2, 1968), with *Spence v. Balogh & Co.,* 216 F. Supp. 492, 494 (D. D.C. 1962), affirmed per curiam 317 F. 2d 909 (C.A.D.C. 1963), certiorari denied 375 U.S. 823 (1963), and *S.E.C. v. Investment Bankers,* 181 F. Supp. 346, 348 fn. 4 (D. D.C. 1960); cf. *Francis C. Currie,* 53 T.C. 185 (1969).

The petitioner argues that the underwriters bore no risks through their purchase of the stock. Because of the "market-out" clause in the underwriting agreement, it argues that the underwriters could terminate their obligations at will prior to the closing date. The clause provided that if the purchasers of 50 percent of the stock, in their absolute judgment, determined that there had been a substantial change in affairs which had had such an effect on the market so as to make a sale of the stock at the agreed price impractical or inadvisable, the obligation of the underwriters would be terminated. In our opinion, that clause cannot be used to eliminate all risks on the part of the underwriters.

In *Blish v. Thompson Automatic Arms Corp.,* 30 Del. Ch. 538, 569, 64 A. 2d 581, 597 (1948), the plaintiff argued that a "market-out" clause, similar to the one involved here, made the underwriting contract invalid for a lack of mutuality, because the underwriters could void the contract at will. The court found that: "The term 'absolute judgment', as indicated, means a judgment based upon sincerity, honesty, fair dealing and good faith, not one evidencing caprice or bad faith." The court found that the "market-out" clause did not make the contractual obligations of the underwriters illusory. Their obligations were conditional, but an objective test determined whether the condition had occurred. Thus, contrary to the petitioner's assertions, the underwriters herein bore far greater risks than mere agents.

We find that while many of the risks of the sale remained with the seller, the underwriters could not terminate the contract at will. They were not mere conduits through which the petitioner

transferred title to the stock to the public. The sale was not a mere formalism which can be disregarded when considering the tax consequences of the sale. Compare *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945).

In maintaining that it is entitled to deduct the underwriters' discount, the petitioner relies upon *Estate of Henry E. Huntington*, 36 B.T.A. 698 (1937). However, *Huntington* is readily distinguishable from the present case. In *Huntington,* the executor sold notes to an underwriter at a discount and later repurchased them at a premium. We held there that the entire amount of the discounts and premiums was a deductible expense. However, the nature of that transaction was far different from the present case. In substance, the executor in *Huntington* merely borrowed money by selling the notes. When he repurchased them, he in effect was repaying the loans. The difference between what he received and what he paid back was the cost of borrowing the money, which we found to be deductible.

In the present case, there was merely a sale of an asset of the estate. We have found that there was in substance, as well as form, a sale to the underwriters. The underwriters' subsequent profit is not a deductible cost of administration.

*Decision will be entered under Rule 155.*