ESTATE OF HELEN BAKER JENNER, Deceased, CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST CO. OF CHICAGO, Executor, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Jenner v. Commissioner
Docket No. 1529-74.
United States Tax Court
T.C. Memo 1977-54; 1977 Tax Ct. Memo LEXIS 387; 36 T.C.M. (CCH) 241; T.C.M. (RIA) 770054; March 3, 1977, Filed *387 Held: 1. Value, on decedent's death, of 226,800 shares of BF stock determined. 2. Value, on decedent's death, of 53,760 shares of CFC stock determined. 3. An underwriting discount in a firm commitment underwriting of stock is not an administrative expense deductible from decedent's gross estate under sec. 2053(a)(2), I.R.C. 1954. Lorentz B. Knouff,Don S. Harnack,Clinton A. Krislov, and Robert J. Ley, for the petitioner. Seymour I. Sherman, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILLES, Judge: Respondent determined an estate tax deficiency of $3,661,955.31. Petitioner asserts an overpayment of estate taxes in the amount of $2,213,941. To resolve the differences between petitioner and respondent, we must determine the value, on Helen Baker Jenner's death, of 226,800 shares of Baker Fentress & Co. (hereinafter BF) stock included in her estate. We must also determine the value at the time of decedent's death of 53,760 shares of Consolidated Financial Corporation (hereinafter CFC) stock included in decedent's estate. Finally, we must determine whether an underwriting discount in a firm commitment underwriting is an administrative expense deductible *388 from decedent's gross estate under section 2053(a)(2). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Helen Baker Jenner died on March 24, 1971, a resident of Illinois. The executor of decedent's estate timely filed a Federal estate tax return with the District Director of Internal Revenue, Chicago, Illinois. Included in decedent's estate at the time of her death were 226,800 shares of BF common stock or approximately 13.9 percent of that company's outstanding stock, and 53,760 shares of CFC common stock or approximately 6.5 percent of that company's outstanding stock. Both BF and CFC had only one class of security outstanding. BF, originally a family partnership, was organized in 1894 to manage investments in the lumber industry. In 1907, BF's precedessor was incorporated, and subsequently, in 1954, BF was reincorporated under its current name in the State of Delaware. BF stock has always been closely held, with fewer than a hundred shareholders, consisting mainly of the Baker and Fentress families and a few key employees. At decedent's death, BF was *389 a non-leveraged, non-diversified closed-end investment company, and was not traded on any public market. [2] *390 Approximately 35 percent of its investment consisted of restricted securities; two restricted issues alone accounted for nearly 28 percent of BF's total investments. One of BF's two large restricted holdings was a 19 percent block of CFC common stock. The other large restricted holding was a 29 percent block of stock in Medford Corporation. Both CFC and Medford were infrequently traded in a thin over-the-counter market. Despite their thin markets and BF's large interest in Medford and CFC, BF's management, in determining BF's net asset value, valued both CFC and Medford on the basis of their most recently traded price. Both companies, either directly or indirectly through a controlled subsidiary, had substantial interests in non-liquid lumber properties. In addition to its substantial restricted holdings in CFC and Medford, BF typically invested at least 5 percent of its net asset value, and over 25 percent of its cost basis, in speculative venture investments referred to as "special situations." Investment in special situations represented one aspect of BF management's policy to invest in low yield, high capital growth securities. As a result of investing in low yield securities, BF's dividend payments to shareholders from 1966 through 1970 were low, ranging between 2 and 2.5 percent of BF's net asset value. In order to expand its capital base, BF retained all realized long-term capital gains. Capital growth was limited to approximately 2 percent per annum, however, since BF's management preferred not to realize capital gains. The parties have stipulated that on decedent's death, the net asset value per share of BF stock was $47.31, while the cost book value was only $18.05, indicating that approximately 62 percent of BF's net asset value was represented by unrealized appreciation. Investment in low yield, high growth stocks, retention of all realized long-term capital *391 gains, and refusal to realize capital gains in order to expand its capital base at a rate greater than 2 percent per annum are indicative of management's policy to tailor BF to the needs of the controlling family group that had no immediate use for greater income. To insure that BF's stock remained closely held, BF's bylaws contained Article XI, entitled "Restrictions on Sale or Transfer of Stock." Article XI provided in part: In the event any stockholder shall desire to sell or transfer any of the Common Stock of the corporation to another person, he shall deliver to the Secretary or Assistant Secretary of the corporation written notice of such desire * * *. The corporation shall have the right, at any time within thirty (30) days after the receipt of such notice, to purchase such Common Stock, or any part thereof, at its book value at the date any such notice is received by the corporation. The book value of the Common Stock of the corporation shall be determined by the Board of Directors and their determination thereof shall be final and binding upon all parties in interest. * * * In case of the death of a holder of Common Stock, the duly appointed legal representatives of such *392 holder shall deliver to the Secretary or Assistant Secretary of the corporation written notice of such death, and the corporation shall have the right at any time after such death and until the expiration of thirty (30) days after receipt of such notice within which to purchase the Common Stock or any part thereof held by such deceased stockholder at its book value at the date any such notice is received by the corporation, which book value shall be determined by the board of directors of the corporation, their determination thereof being final and binding upon all parties in interest. * * * Although book value was determined at the absolute discretion of the corporate directors, all corporate redemptions had occurred at what the parties refer to as "cost book value." Cost book value was determined by adding together the total cost of all securities held in BF's portfolio, and dividing that sum by the number of BF shares outstanding. As a result of Article XI and the directors' desire to keep BF stock closely held, all known transfers of BF stock prior to decedent's death were either intra-family, between a family and a decedent's estate, to or from trustees or nominees, or to BF. *393 Eight transfers, redemptions involving a total of 15,800 shares, occurred during a three-year period prior to decedent's death. All redemptions were at cost book value, ranging from a low of $16,87 per share on March 11, 1968, to a high of $18,26 per share on June 16, 1970. On the date of decedent's death the cost book value of BF stock was $18.05 per share. Mr. James Fentress, BF's president, a member of its board of directors, and a member of its executive committee, indicated that the board of directors was so concerned with keeping BF's stock closely held by family members that had any stockholder attempted to transfer its BF stock to an unknown third party, the corporation would have exercised its right of first refusal under Article XI. This right, which historically had always been exercised at cost book value, would have been exercised irrespective of the amount of stock the shareholder desired to sell. CFC's predecessor was organized about 1900, and was principally involved in producing lumber products. Because of financial problems in the 1920's, CFC was reorganized, and BF, as well as some BF shareholders, acquired financial interests in CFC. Following World War II, *394 CFC sold some of its lumber properties and started investing in common stock. In 1960, CFC registered with the SEC as a non-diversified, closed-end investment company. Throughout its existence, CFC remained non-leveraged. In 1969, CFC's real estate and related assets were transferred to a wholly owned subsidiary, Consolidated-Tomoka Land Company (hereinafter Tomoka). Thereafter, 18 percent of Tomoka's stock was publicly distributed in a secondary offering. Since contributing its real estate and related assets to Tomoka, CFC's assets consist primarily of an investment portfolio. In many respects, CFC is similar to BF. In 1970, the last complete fiscal year prior to decedent's death, all of BF's directors were also directors of CFC; all CFC's officers were also officers of BF. CFC had a policy of distributing only dividend income from stocks held in its portfolio, but retained all realized capital gains. Generally, CFC invested in low yield, high growth stocks and restricted its capital growth, or realized capital gains, to less than 2.25 percent of its net asset value. During the period 1966 through 1970, CFC's dividend yield averaged less than 2-1/2 percent of CFC's net asset value. *395 Unlike BF, CFC was publicly traded on a thin over-the-counter market. From January 1, 1971, to March 24, 1971, CFC was traded on 20 different days, with a total volume of 10,306 shares traded. Bid prices during the same period ranged from a low of $51.00 a share on January 6, 1971, to a high of $64.50 a share on March 24, 1971. As of March 24, 1971, CFC had less than 650 shareholders; BF, the largest shareholder, owned approximately 19 percent of CFC's outstanding stock. Because CFC was publicly traded, management, although investing primarily in growth stocks, was more conservative in placing CFC's investments in "special situations." Many of the more speculative stocks found in BF's portfolio were omitted from CFC's portfolio. Nevertheless, CFC's management tended to place its money in venture situations, and thereby favor the investment needs of CFC's principal shareholders who preferred capital appreciation to high yield. As of March 24, 1971, approximately 32 percent of CFC's portfolio was invested in securities with restricted trading. During the 1960's BF, a personal holding company, and CFC, a non-diversified, registered, closed-end investment company, were operated in *396 tandem by their interlocking management. Following the contribution of CFC's real estate to Tomoka, BF and CFC's management concluded that it would be appropriate to merge CFC into BF. Pursuant to this objective, BF registered with the SEC in 1970 as a closed-end, non-diversified investment company. On November 19, 1970, both boards of directors adopted a resolution of merger, and consummation was planned for March 31, 1971. Under the proposed merger, CFC was to merge into BF, with BF the surviving company; Article XI was to be deleted from BF's bylaws; valuation of the CFC stock was to be based on a ratio of the net asset value of BF to the net asset value of CFC; and either party had the right to unilaterally terminate the proposed merger if the SEC did not approve it on or before June 30, 1971. Following application with the SEC for approval of the merger, the SEC gave public notice that interested parties had from March 16, 1971, until March 29, 1971, to request a hearing with the SEC on the merger. On March 16, 1971, CFC's shareholders voted for the merger. One shareholder, owning 8,186 shares, objected. On March 17, 1971, BF's shareholders voted on the merger; 1,400,062.5 *397 shares were voted in favor, and 10,000 shares were voted against. Despite overwhelming shareholder approval, as of decedent's death, there was uncertainty whether the merger would be approved by the SEC. The SEC staff expressed doubt whether large holdings of restricted secrities in BF's and CFC's portfolios, including BF's interest in Medord, had been properly valued. Further, the CFC shareholder who voted against the merger indicated that he might request a formal SEC hearing on the merger, and filed a statutory notice of objection so that he could pursue rights of appraisal and payment under Florida law. If the SEC held a formal hearing, management would have delayed the merger until 1972. On March 30, 1971, the SEC finally issued its approval of the proposed merger, and the merger occurred on March 31, 1971. Under the merger agreement, CFC's shareholders received 1.7142 shares of BF stock for every share of CFC stock they owned. This figure was strictly based on the ratio of CFC's net asset value to BF's net asset value. After exchanging its CFC stock for BF stock the Jenner estate owned a total of 319,347 shares of BF stock. On April 29, 1971, Continental Illinois National *398 Bank and Trust Company of Chicago was appointed executor of the Jenner estate. In order to raise between 5.8 and 8.8 million dollars needed to satisfy debts, taxes, and administrative expenses, the executor decided to sell some of the estate's BF stock. After conferring with at least two brokerage firms, representatives of which indicated that due to the large block of stock owned by the estate, the executor decided that the best method of selling the stock would be though a registered secondary offering. In preparation for a secondary offering, a preliminary registration statement was filed with the SEC on February 11, 1972. On May 11, 1972, petitioner entered into a firm commitment underwriting agreement with Blyth & Co., Inc., which represented an underwriting syndicate of 69 other underwriters. Paragraph 5 of the agreement, which describes the purchase price, sale, and delivery of shares, reads in part: 5. Purchase, Sale and Delivery of Shares. On the basis of the statements, representations, warranties and agreements herein contained, but subject to the terms and conditions herein set forth, the Selling Stockholder [petitioner] agrees to sell to the Underwriters * * * and *399 each such Underwriter agrees, severally and not jointly, to purchase from the Selling Stockholder, at a purchase price of $38.85 per share, the respective numbers of Shares set forth opposite the names of the Underwriters in Schedule A hereto. Definitive certificates for the Shares will be delivered by the Selling Stockholder to you for the accounts of the several Underwriters against payment of the purchase price therefor by the several Underwriters by certified or official bank check or checks in Chicago funds, payable to the order of the Selling Stockholder, * * * date of payment and delivery being herein called the "Closing Date." The certificates for the Shares so to be delivered will be made available to you at such office for checking at least one full business day prior to the Closing Date and will be in such names and denominations as you may request. Paragraph 7(a), which defines the expenses to be borne by petitioner reads in part: 7. Expenses. The Selling Stockholder [petitioner] covenants and agrees with the several Underwriters and with the Company [BF] that: (a) * * * the Selling Stockholder will pay all costs and expenses incident to the performance of the obligations *400 of the Company and the Selling Stockholder hereunder, including the fees and expenses of the Company's accountants and counsel for the Company and Selling Stockholder and all other costs and expenses incident to the preparation, printing and filing under the Act of the Registration Statement, each Preliminary Prospectus, the Prospectus and each amendment and supplement thereto (except as provided in Section 6(a) hereof); all fees and disbursements (not exceeding $11,000) incurred by the Underwriters in connection with the qualification of the Shares under state Blue Sky and securities laws as provided in Section 6(c) hereof (including fees and disbursements of counsel for the Underwriters); the cost of furnishing to the Underwriters copies of the Registration Statement, each Preliminary Prospectus, the Prospectus, and each amendment and supplement thereto, in such numbers as they may reasonably request; the cost of printing this Agreement; the cost of the premiums payable on the insurance policy or policies described in Section 9(a) hereof; and any other costs and expenses incident to the performance of the obligations of the Company and of the Selling Stockholder hereunder; provided, *401 however, that the Company will pay the cost of printing and preparing stock certificates for the Shares and the charges of its transfer agent and registrar. In addition to the above paragraphs, paragraph 8 of the underwriting agreement, the "market-out" paragraph, provided that the underwriters could unilaterally terminate the contract in the event that SEC approval was not obtained, legal counsel objected to the offering, accountants disagreed on valuation, or in the opinion of the "majority in interest of the Underwriters" a "material adverse change" in the net asset value of BF occurred between the date of the most recent prospectus and the proposed date of sale. As is normally the case with firm commitment underwriting, nowhere in the underwriting agreement was petitioner contractually required to pay the underwriters an underwriting commission or discount. On May 11, 1972, the date the underwriting agreement was signed, the underwriting group offered 300,000 shares of BF stock for sale to the public at $42.00 per share. On May 17, 1972, the closing date of the underwriting agreement, petitioner, pursuant to its contractual requirements under the underwriting agreement, delivered *402 300,000 shares of BF stock to Blyth & Co., Inc. Although not required to do so under the terms of the underwriting agreement, petitioner also delivered to Blyth & Co., Inc., a check for $945,000. The receipt for this check describes the payment as "underwriting discount of $3.15 per share in connection with public offering of 300,000 shares of Baker, Fentress & Company common stock." Also on May 17, 1972, Blyth & Co., Inc., delivered a check to petitioner for $12,600,000 in exchange for the 300,000 shares of BF stock, equalling a payment of $42.00 per share. This amount was $945,000 more than required under the underwriting agreement. The net effect of these transfers is that on the closing date, May 17, 1972, Blyth & Co., Inc., received 300,000 shares of BF stock, and petitioner received a net payment of $11,655,000 for the stock, or $38.85 per share. The Executor's First Current Account, consisting of 33 pages that contained several hundred items of receipts and disbursements for the period March 29, 1971, through January 29, 1973, was filed with the Probate Division of the Circuit Court of Cook County on May 1, 1973, and approved on the same day. Among those disbursements approved *403 by that court as proper administrative expenses are the following items: ITEM
AMOUNT
Registration Fee
$ 2,722.00
Knouff & Ley legal fee and expenses
25,002.25
Consolidated-Tomoka Land Co.
reimbursement for expenses
610.00
Consolidated-Tomoka Land Co.
reimbursement for expenses
256.93
Rex Meighen & Co. accounting services
7,500.00
Touche Ross & Co. accounting services
24,000.00
Blyth & Co., Inc., reimbursement
Blue Sky Laws expense
5,025.00
Sorg Printing Company printing expense
6,205.16
Fred James & Co. Premium for Securities
Act Liability Insurance
66,780.00
Bell, Boyd, Lloyd, Haddad & Burns legal
fee and expenses
39,769.10
Sorg Printing Company printing expense
$48,240.03
James Fentress reimbursement of expenses
740.56
Glenn Ingram & Co. accounting services
995.00
Sullivan & Cromwell legal fee and
expenses
7,054.89
O'Melveny & Meyer legal fee and expenses
1,269.40
Underwriting discount
945,000.00 [3] *404 $1,181,170.32 ULTIMATE FINDINGS OF FACT The value on March 24, 1971, of 226,800 shares of BF stock owned by decedent's estate was $4,093,740, or $18.05 per share. The value on March 24, 1971, of 53,760 shares of CFC stock owned by decedent's estate was $1,827,840, or $34.00 per share. OPINION Helen Baker Jenner died on March 24, 1971. Included in her estate were 226,800 shares of BF stock and 53,760 shares of CFC stock. We must determine the value, on the date of death, of the BF and CFC stock included in decedent's estate. We must also determine whether an underwriting discount incurred in a firm commitment underwriting of BF stock is deductible from decedent's gross estate under section 2053(a)(2). The executor, in filing decedent's Federal estate tax return valued the BF and CFC stock at $10 per share and $55 per share, respectively. Respondent issued a notice of deficiency in which he valued the BF and CFC stock at approximately $28.56 per share and $49.16 per share, respectively. On brief, both parties modified their valuation figures. Petitioner now contends the value of the BF and CFC stock is $11.60 per share and $25.90 per share, respectively. *405 Respondent contends the values are $31.50 per share for the BF stock and $55 per share for the CFC stock. We conclude the value of the BF stock is $18.05 per share, and the value of the CFC stock is $34.00 per share. Section 2031(a) reads: General. -- The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated. Although section 2031(a) uses the term "value," that word is not statutorily defined. Section 20.2031-1(b), Estate Tax Regs., equates the term "value" with "fair market value": The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of decedent's death * * *. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. It is relatively easy to determine the value of small quantities of widely traded securities. Valuation of infrequently traded securities *406 or securities not publicly traded, however, can be a difficult matter. Section 2031(b) recognizes the special problems inherent in valuing infrequently traded securities and provides the following directions: In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange.
Section 20.2031-2(f)(2), Estate Tax Regs., expands on section 2031(b) and notes that where bid or asked prices are unavailable or do not reflect the fair market value of a stock, the company's net worth, prospective earning power, and dividend paying capacity should be taken into account along with other relevant factors. As noted in Hamm v. Commissioner,325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court: Valuation of stock for tax purposes is a matter of "pure *407 fact." * * * * * *
* * * One might say in general that these factors are the things that a buyer and a seller would wish to know and consider before reaching a conclusion as to fair value. * * * "[There] is no single formula universally applicable in determining such value and in the absence of evidence of an open market for stock it is proper to consider all the circumstances connected with the corporation in determining its fair market value." [Citation omitted.] In determining the value for the BF and CFC stock, we have made use of the entire record including the stipulation of facts made by the parties, all documentary evidence, the complete and detailed testimony of all witnesses, with particular attention given to the expert witnesses' testimony and their valuation reports. Some of the factors that have shaped our conclusion are the historical development and growth of the companies, their liquidity, the underlying assets, including their net asset value and the valuation methods used in reaching the net asset value, the cost of the underlying assets, the potential growth and development of the underlying assets, the management policies of the respective corporations, the number *408 of shareholders and the number of shares of stock outstanding, the historical earnings and projected future earnings, the dividend payment policies, the record of exchanges and trades in the stocks, the rate of capital expansion, comparable companies and their market values, the general investment community and its attitude toward closedend investment companies, as well as other factors which the parties believed were significant in valuing the stock of BF and CFC. We have devoted particular attention to the testimony and reports of the three expert witnesses, all of which approached the problem of valuing BF and CFC stock differently. Petitioner's first valuation expert, Frank Russell Anderson, noted that BF was not publicly traded, did not distribute realized capital gains, and had not substantially increased its annual dividend or investment return over the past five years. Therefore, he concluded, a prospective investor would only purchase BF stock as a long-term income investment. During March 1971, the average yield of new offerings of income securities was 7.84 percent, with many sound corporate bonds paying over 8 percent. Based on BF's 1970 dividend of 88 cents per share, *409 Anderson concluded that an informed investor would pay no more than $11.00 per share, thereby producing a yield of 8 percent per year on the BF stock. Anderson discounted this figure because BF's dividends had not increased significantly over the preceding five years, suggesting little potential existed for future income growth despite inflation or money market conditions. Further discount was justified by BF's lack of liquidity within the portfolio and BF's failure to realize capital gains. Taking these factors into account, Anderson concluded that a sale of BF stock might occur between $8.00 and $10.00 a share, and therefore, he arrived at an average value of $9.00 per share for the BF stock. At trial, Anderson expressed an opinion that on March 24, 1971, the value of the CFC stock included in decedent's estate was $18.00 per share. In forming this opinion, Anderson used an approach similar to that employed in valuing the BF stock. After briefly describing the restricted securities and the non-liquid assets held by CFC, Anderson noted that, on a total investment portfolio of $35,000,000, CFC produced a return of 5.3 percent in 1970 and realized gains of only.1 percent. He reasoned *410 an informed investor would want an 8 percent return on an income security, and at 8 percent, with a $1.80 annual dividend, an informed investor would purchase the CFC stock from decedent's estate at no more than $22.50 per share. Discount from this $22.50 figure was warranted, Anderson felt, since the large block of CFC stock owned by the estate was restricted. After taking into account the problems of restricted stock, Anderson concluded that $18.00 per share was a reasonable price to pay for the CFC stock owned by decedent's estate. Petitioner's second expert witness, George K. Hendrick, Jr., valued the BF and CFC stock owned by decedent's estate on the date of death at $14.19 per share and $33.80 per share, respectively. In arriving at his valuation of the BF stock, Hendrick adopted a two step approach. First he established a hypothetical over-the-counter value for BF by looking at publicly traded comparable companies. He then discounted this figure because BF stock was not publicly traded, and if it were, the large block of BF stock owned by the Jenner estate would be subject to SEC trading restrictions. In selecting comparable companies that would help establish a hypothetical *411 over-the-counter stock valuation, Hendrick noted that BF was a non-leveraged, non-diversified, closed-end investment management fund. Having evolved from a family enterprise, BF had approximately 35 percent of its net asset value in restricted securities; two restricted issues alone accounted for 28 percent of BF's portfolio. One of the holdings, CFC, also had considerable restricted holdings, two of which accounted for approximately 32 percent of CFC's net asset value. The other large restricted holding in BF's portfolio, Medford, had a substantial portion of its assets in non-liquid lumber properties. In addition to BF's extensive holdings in non-liquid, restricted assets, Hendrick felt that other factors would substantially effect the hypothetical over-the-counter price of BF stock. First, over 60 percent of BF's net asset value was represented by unrealized capital gains, giving BF an unusually high exposure to eventual long-term capital gains tax. Second, in contrast to most closed-end investment companies, BF did not distribute realized long-term capital gains to its shareholders. Third, BF had few shareholders and few shares in the hands of non-family members, so that if *412 it were traded over-the-counter, it would trade in a very thin market. Fourth, closed-end, non-diversified, investment companies were not widely followed, and were not particularly well-known or attractive to institutional buyers. Considering these factors, Hendrick selected four comparable non-diversified, closed-end investment companies, all of which traded at a 30 percent to 50 percent discount from net asset value. A 50 percent discount from net asset value was warranted in determining a hypothetical over-the-counter price for BF, because BF's management had valued BF's holdings in CFC and Medford at their market price, a price that, considering blockage, was unrealistically high; BF had exceptionally large holdings in restricted securities; BF's portfolio contained large unrealized capital gains on which taxes would eventually have to be paid; and finally, BF had an exceptionally small dividend distribution. Applying a 50 percent discount to BF's net asset value, Hendrick determined that a reasonable over-the-counter trading price for BF was $23.65. After arriving at a hypothetical over-the-counter value for the BF stock, Hendrick believed that a discount was warranted because *413 the Jenner estate held approximately 11 percent of the outstanding BF stock and therefore, under SEC rules, its trading was restricted. In view of this restriction, Hendrick felt that the only practical method of marketing the estate's BF stock would be through a private sale, with an investment letter that restricted resale. Such a restriction would reduce the hypothetical over-the-counter value of the stock by 40 percent, to $14.19 per share. At trial, Hendrick described how he arrived at a value of $33.80 per share for the CFC stock owned by decedent's estate. First, CFC was a closed-end, non-diversified investment company, with approximately 32 percent of its portfolio invested in restricted securities. CFC's management valued these restricted securities at their most recently traded market price despite a thin trading market in the securities, and CFC's inability to easily liquidate its restricted holdings. Second, as with BF, an extraordinarily large portion of CFC's net asset value was represented by unrealized capital appreciation that would eventually be taxed. Third, CFC did not distribute its realized capital gains, but retained them for capital growth. Fourth, CFC's *414 management adopted investment policies such as small dividend payments, retention of capital gains, and general hesitancy to realize capital gains that benefited controlling family shareholders, not the investing public. Finally, since CFC's public market was extremely thin--approximately 10,000 shares were traded between January 1, 1971 and March 24, 1971--the large block of CFC stock would have to be discounted for blockage. Viewing all of these variables, and after considering what he thought to be an artificial climb in CFC's stock from January 1, 1971 to March 24, 1971, Hendrick applied a 35 percent discount to CFC's January 1, 1971, traded price and arrived at a valuation of $33.80 per share. The final expert witness to testify on the value of the BF and CFC stock was respondent's expert, Thomas J. Fogarty. In valuing the stock, Fogarty first assumed that the merger of BF and CFC, scheduled for March 31, 1971, was an accomplished fact on March 24, 1971. Next he determined what a purchaser would be willing to pay for 319,347 shares of BF stock, the amount of BF stock the Jenner estate owned subsequent to the merger. Finally, he discounted this price to cover the likelihood *415 that the merger would not be accomplished. In arriving at a hypothetical trading price for the stock of the merged companies, Fogarty observed that CFC, on March 23, 1971, traded at $64.00 per share. Since, on the actual merger date, March 31, 1971, every share of CFC stock was exchanged for 1.7142 shares of BF stock, Fogarty divided $64.00 by 1.7142, and concluded that approximately $37.00 per share was a reasonable figure for the "merged" companies stock on March 24, 1971. To the $37.00 figure, Fogarty applied a 5 percent discount for blockage, and an 8 percent discount for marketing expenses. Finally, to cover the contingency that the merger would not occur on March 31, 1971, Fogarty applied a 10 percent discount, giving the 319,347 shares of stock of the "merged" company a value of $9,119,700 or approximately $28.55 per share for the BF stock. Since, under the merger, each share of CFC stock was exchanged for 1.7142 shares of BF stock, Fogarty's valuation of the CFC stock was therefore $48.94 per share. [4] *416 The testimony and written reports of all three expert witnesses were considered in reaching the values of $18.05 per share for the BF stock, and $34.00 per share for the CFC stock. We have not, however, relied exclusively on the approach of any one of the witnesses. Although each witness employed a different method in valuing the BF and CFC stock, each method had weaknesses. While not attempting to delineate each weakness, a few were more significant than others. Petitioner's first witness, Frank Russell Anderson, placed an undue emphasis on the current yield of BF and CFC. Although yield is an important factor to be considered when valuing stocks, it should not exclude other considerations. In reaching his valuation, Anderson failed to consider that both BF and CFC invested extensively in venture situations that traditionally have a low yield, but present potential capital growth. In light of BF and CFC's underlying portfolio, we believe Anderson erred in his initial premise *417 that a knowledgeable buyer would purchase BF and CFC for income securities. See generally Estate of Maurice Gustave Heckscher,63 T.C. 485 (1975). George K. Hendrick, Jr., petitioner's second witness, was the most persuasive and convincing of all three valuation experts. In arriving at his values for BF and CFC, he chose comparable non-diversified, non-leveraged, closed-end investment management funds and convincingly demonstrated their similarities to BF and CFC. Importantly, Hendrick did not rely exclusively on any one factor such as yield, underlying asset value, or potential growth. On extensive cross-examination, both Hendrick and his valuation report withstood extensive scrutiny, indicating a high degree of competence and familiarity with valuation problems in general, as well as a sound approach in valuing the securities in question. Although Hendrick was the most convincing expert witness, he failed to give adequate consideration to Article XI of BF's bylaws. Mr. James Fentress, BF's president, a member of BF's board of directors, and a member of BF's executive committee stated at trial that had any BF shareholder attempted to transfer his stock to an unrelated third *418 party, BF's board of directors would have exercised their right of first refusal and purchased the shareholder's stock under the provisions of Article XI. Although Article XI states that the corporation's repurchase rights will be at book value, all prior purchases had been at a figure referred to as cost book value.Incorporating the board of directors' prior history of repurchasing stock at cost book value into Article XI, we believe any repurchase of the Jenner estate's BF stock would have been at cost book value. In light of Article XI, and the board of directors' intent to repurchase all stock that a shareholder desired to transfer to an unrelated third party, the value to the Jenner estate of its BF stock could not have been less than the amount the board of directors would pay to repurchase the estate's stock. Since the board of directors, acting for the corporation, would repurchase any stock the estate attempted to transfer to an unrelated third party, and since all repurchases under Article XI had historically occurred at cost book value, and since the parties have stipulated that cost book value of BF stock on decedent's death was $18.05 per share, the value of the BF stock *419 to the estate on decedent's death could not have been less than $18.05 per share. Respondent's single expert witness, Thomas J. Fogarty, adopted an unusual and improper approach in valuing the BF and CFC stock. Initially, he assumed that the merger of CFC and BF was an accomplished fact on decedent's death, so that only one block of stock required valuation. Although the merger occurred on March 31, 1971, it was not until March 30, 1971, that the merger received SEC approval. Prior to receiving SEC approval significant contingencies existed, any of which could have delayed the merger until 1972: one CFC shareholder who voted against the merger had filed a statutory notice of objection to the merger, the same shareholder indicated he might request a formal SEC hearing on the merger, and the SEC staff was concerned that the value of underlying assets had been improperly determined. Therefore, by assuming facts that did not exist, that is, assuming that on March 24, 1971, the merger was all but an accomplished fact, Fogarty erroneously failed to consider the two corporations as independent and separate entities. Fogarty's valuation exhibited other flaws. He improperly selected comparable *420 companies: many of his comparables were leveraged, enabling them to have larger dividend and capital gains distributions than non-leveraged investment companies; all of his comparables, unlike BF and CFC, were diversified; all of his comparables had their largest holdings in highly liquid, easily valued and readily traded stocks such as IBM, Sears Roebuck, Xerox, and Texaco. In general, Fogarty's comparables failed to reflect BF and CFC's underlying portfolio and restricted assets, management's policy of managing BF and CFC primarily for family members and significant shareholders, and BF and CFC's general characterization as non-leveraged, non-diversified, closely-held, closed-end investment companies. Considering Fogarty's failure to view BF and CFC as independent companies, his error in assuming that the merger of BF and CFC was an accomplished fact on March 24, 1971, and his failure to carefully select comparable companies, we are unable to give his testimony and valuation report much weight. After considering the reports and testimony of the parties' expert witnesses, and after considering flaws or inaccurate assumptions, some of which we have mentioned, and after considering *421 the facts, extensive trial record, and exhibits submitted by both parties, we conclude that the values of the BF and CFC stock owned by decedent's estate on March 24, 1971, were $18.05 per share and $34.00 per share, respectively. The final issue we must resolve is whether an underwriting discount of $945,000 is an administrative expense deductible from decedent's gross estate under section 2053(a)(2). [5] Resolution of this issue is controlled by our decision in Estate of Marcellus L. Joslyn,63 T.C. 478 (1975).[6] *422 *423 In order to obtain sufficient money to properly administer decedent's estate, petitioner entered into an underwriting agreement, dated May 11, 1972, with Blyth & Co., Inc., as representative of an underwriting syndicate. Paragraph 5 of the agreement notes that, [The] Selling Stockholder [petitioner] agrees to sell to the Underwriters [Blyth & Co., Inc., et al.] named in Schedule A hereto, and each such Underwriter agrees severally and not jointly, to purchase from the Selling Stockholder, at a purchase price of $38.85 per share, the respective numbers of Shares set forth opposite the names of the Underwriters in Schedule A hereto. [Emphasis added.] Paragraph 7, as set out in our Findings of Fact, obligated petitioner to pay certain expenses, now referred to as "incidental expenses," in connection with the secondary offering. *424 Nowhere in the underwriting agreement was petitioner bound to pay any underwriting commissions or "underwriting discount." Notwithstanding these contractual provisions, on May 17, 1972, the closing date of the underwriting agreement, petitioner delivered to Blyth & Co., Inc., 300,000 shares of BF stock, and a check for $945,000, for "underwriting discount," an amount which petitioner was not legally obligated to pay. Also on May 17, 1972, Blyth & Co., Inc., paid petitioner $12,600,000, a sum exactly $945,000 more than required under the underwriting agreement. Petitioner now seeks to deduct, as an administrative expense, the $945,000 "underwriting discount." On its face, the underwriting agreement is a sales contract, in which, in clear language, petitioner agreed to sell and the underwriters agreed to purchase 300,000 share of BF stock at $38.85 per share. As in Estate of Marcellus L. Joslyn,63 T.C. 478, 484 (1975), "There was no evidence that the underwriting agreement was other than a bona fide sale to the underwriters; they were acting as principals and were not mere agents for the estate." Petitioner argues that the "market-out" clause in the underwriting agreement shifted *425 the risk of the secondary offering from the underwriters to petitioner. In Estate of Marcellus L. Joslyn,supra, we confronted the same argument and noted, "[While] many of the risks of the sale remained with the seller, the underwriters could not terminate the contract at will. They were not mere conduits through which the petitioner transferred title to the stock to the public. The sale was not a mere formalism which can be disregarded when considering the tax consequences of the sale." Although petitioner gave Blyth & Co., Inc., a check for $945,000, for "underwriting discount," petitioner was under no legal obligation to make such a payment. Similarly, Blyth & Co., Inc., which paid petitioner $12,600,000, or $42.00 per share for the BF stock, was required, under the underwriting agreement, to pay petitioner only $11,655,000 or $38.85 per share. We can only conclude that the unnecessary overpayment by Blyth & Co., Inc., for the BF stock, and petitioner's simultaneous reimbursement of the overpayment by giving Blyth & Co., Inc., a check for "underwriting discount" were mere paper transactions. The net effect therefore is that petitioner received its contracted for $38.85 per *426 share and the underwriters received 300,000 shares of BF stock.The underwriters' profit upon resale to the public cannot be turned into an administrative cost deductible by the estate through such paper transactions. [7] We have found that the substance as well as the form of the underwriting agreement was a sale of stock to the underwriters at a contract price of $38.85 per share. Having determined the value of the BF and CFC stock, and having further determined that the underwriting discount is not a deductible administrative expense, Decision *427 will be entered under Rule 155. Footnotes
1. Unless otherwise noted, statutory references are to the Internal Revenue Code of 1954.↩
2. An investment company is non-leveraged if it has no debt in its capitalization; non-diversified if it has more than five percent of the value of its total assets invested in one issue; and closed-end if it has no redeemable security outstanding and does not constantly offer new shares for sale. Investment Company Act of 1940, ch. 686, tit. I, sec. 5, 54 Stat. 800, 15 U.S.C. sec. 80a-5↩.
3. Joint exhibit 30-AD indicates that the underwriting discount was $945,230.00. Joint exhibit 30-AD, however, was compiled from figures found on joint exhibit 29-AC. Joint exhibit 29-AC, paragraph 107, records the underwriting discount as $945,000, as does petitioner's receipt from Blyth & Co., Inc. We therefore conclude joint exhibit 30-AD is in error by $230.
4. Although Fogarty's valuation report described the process of how he arrived at a value of $9,119,700 for 319,347 shares of "merged" BF stock, his mathematics were not set out. We are therefore unable to determine if he arrived at a total value of $9,119,700 by using discounts different from those described, or if he arrived at a value of $9,119,700 through mathematical errors.
5. Petitioner contends it incurred expenses of $1,181,170.32 in connection with a registered secondary offering of 300,000 shares of BF stock, all of which are deductible.Respondent, on brief, concedes that incidental expenses of $236,170.32 are deductible, but contests the deductibility of the remaining item, an underwriting discount of $945,000.↩
6. In Estate of Marcellus L. Joslyn,57 T.C. 722 (1972), we determined that both incidental expenses and an underwriting discount incurred in connection with a secondary offering of stock, having previously been allowed to reduce the value of the stock included in decedent's gross estate, could not also be deducted from decedent's gross estate under sec. 2053. We stated (57 T.C. at 726), "We perceive no rational basis for allowing both the reduction in value and the deduction for the same expenses. There is no judicial authority supporting the allowance of both tax benefits, nor is there any indication that Congress intended to allow both tax benefits." Our decision was reversed by the United States Court of Appeals for the Ninth Circuit in Estate of Joslyn v. Commissioner,500 F. 2d 382 (9th Cir. 1974). The Court of Appeals held we "erred in deciding that the allowance of a deduction for payment of taxes and administration and other expenses was impermissible as a 'double deduction'," and remanded the case so that we could determine whether the deductions claimed were within the purview of sec. 2053. In our second Joslyn opinion, 63 T.C. 478 (1975), we concluded that incidental expenses were deductible administrative expenses under sec. 2053(a)(2). Again, however, we disallowed any deduction for an underwriting discount, finding that in substance there was a sale to the underwriters, and the underwriters' subsequent profit was not a deductible cost of administration. Since the only expense still in contention in the case before us is an underwriting discount, we rely only on our second Joslyn opinion to disallow the deduction for underwriting discount. We need express no opinion whether, in future cases not appealable to the Ninth Circuit, we will rely on the alternative grounds expressed in our first Joslyn↩ opinion to disallow deductions of underwriting discounts.
7. As a final argument, petitioner contends that since the Probate Division of the Circuit Court of Cook County approved the estate's expenditure of $945,000 for an underwriting discount, we must also allow petitioner to deduct the underwriting discount from decedent's gross estate. We disagree with petitioner's argument. The allowability of an expenditure by a probate court under whose jurisdiction the estate is being administered "establishes a threshold and not an exclusive condition" of deductibility under sec. 2053(a). Estate of David Smith,57 T.C. 650, 660-661 (1972), affd. 510 F. 2d 479 (2d Cir. 1975), cert. denied 423 U.S. 827↩ (1975).