JAMESON, Senior District Judge.
The executor of the estate of Helen Baker Jenner, deceased, appeals from a decision of the Tax Court holding that the commission the estate paid to the underwriters for the public sale of a large block of stock through a registered secondary offering was not a deductible administrative expense under section 2053(a)(2) of the Internal Revenue Code of 1954.[1] 36 T.C.M. (CCH) 241 (1977). This court has jurisdiction pursuant to section 7482 of the Code. We reverse.

Factual Background

Helen Baker Jenner, a resident of Illinois, died testate on March 24, 1971. The decedent owned 226,800 shares of the common stock of Baker, Fentress & Co. (B-F) and 53,760 shares of the common stock of Consolidated Finance Corporation (CFC). B — F and CFC were closed-end investment companies registered with the Securities and Exchange Commission (SEC). B — F was the largest shareholder in CFC, and both were controlled by interlocking management. B-F stock was not traded publicly, while CFC was traded in a thin over-the-counter market.
Prior to decedent’s death, B-F and CFC had resolved to merge CFC into B-F. The merger was completed, with SEC approval, on or about March 31, 1971. Following the *1102 merger the estate held 319,347 shares of B-F, representing more than 11% of the stock outstanding.
During the course of administration, the executor concluded that in order to satisfy debts, taxes, and expenses of the estate and effect distributions it would be necessary to raise an additional $5,800,000 to $8,800,000 in cash. The executor decided to sell 300,-000 shares of the B-F stock to obtain the necessary funds. Because of the large number of shares and the large percentage that block represented of the total outstanding stock, the executor determined, after conferring with brokerage firms, that the only viable method for selling the stock would be through a registered secondary offering.[2] On May 11, 1972, the executor entered into a firm commitment[3] underwriting agreement with Blyth & Co., Inc., which represented an underwriting syndicate of 69 other underwriters.
Under the terms of the underwriting agreement, the estate agreed to deliver to the underwriters a total of 300,000 shares of B-F stock and the underwriters agreed to pay the estate $38.85 per share. The estate was obligated to pay all costs and expenses incident to registration of the offering with the SEC and under state Blue Sky laws. The agreement also provided that the underwriters unilaterally could terminate the contract in the event of certain enumerated contingencies, including, inter alia, a “material adverse change” in the net asset value of B-F between the date of the most recent prospectus and the proposed date of sale.
Although it is clear that the stock was to be offered to the public at $42.00 per share, there is nothing in the underwriting agreement which fixes that amount. Nor is there any requirement that the estate pay the underwriters a commission or discount. However, the registration statement, which was dated the same day as the agreement, listed the price to the public as $42.00 for a total sales figure of $12,600,000.[4] The registration statement also reported that there was an “Underwriting discount” of $3.15 per share, so that the “Proceeds to the Selling Stockholder” would amount to $38.85, which equals the per share figure stated in the underwriting agreement.
On May 17, Blyth delivered to the executor a check for $12,600,000, representing the total paid by the public for the 300,000 shares at $42.00 per share. The executor, in return, delivered a check for $945,000 to Blyth. The receipt for that check describes the payment as an “Underwriting discount of $3.15 per share in connection with public offering of 300,000 shares of Baker, Fen-tress & Company common stock.” The executor also paid other incidental costs of the offering amounting to $236,170.32. In its accounting to the probate court, the executor reported both the $945,000 and the $236,170.32 as expenses of the secondary offering, making a total of $1,181,170.32. The Probate Division of the Circuit Court of Cook County, pursuant to Illinois law, approved the accounting, including the total expenditures for the public offering of the stock, on May 1, 1973.
The Commissioner has conceded that the incidental expenses of $236,170.32 were properly deducted. The deduction of $945,-000 paid to Blyth was denied by the Tax Court.

The Tax Court Decision

The Tax Court found that the deductibility of the underwriters’ discount or commission was controlled by its decision in Estate of Marcellus F. Joslyn, 63 T.C. 478 (1975). *1103 (Joslyn II). In that case the Tax Court had denied the deduction of the underwriters’ discount on the sale of a large block of stock through, as here, a registered secondary offering made pursuant to a firm commitment underwriting agreement. The Tax Court in Joslyn II viewed the transaction as a sale to the underwriters and the discounted amount as the underwriters’ “profit”, and concluded that the amount was not a deductible cost of administration under section 2053(a)(2). 63 T.C. at 485.
Relying on Joslyn II, the Tax Court held “that the substance as well as the form of the underwriting agreement was a sale of stock to the underwriters at a contract price of $38.85 per share”, that the “unnecessary overpayment” by the underwriters and the issuance of the check for $945,000 to the underwriter for “underwriting discount” were mere paper transactions, which could not be turned into a deductible expense.

The Joslyn Case

Subsequent to the decision of the Tax Court in this case the Court of Appeals for the Ninth Circuit reversed the Tax Court’s decision in Joslyn II. Estate of Joslyn v. Commissioner, 566 F.2d 677 (9 Cir. 1977). The Commissioner recognizes that the “facts [in this case] are admittedly similar and the same issue is presented”, but argues that the Ninth Circuit’s decision was wrong and, in any case, is not controlling in this circuit and should not be followed.
The question of the deductibility of the underwriter’s commission in the Joslyn estate was first considered in the initial decision of the Tax Court. Estate of Marcellus F. Joslyn, 57 T.C. 722 (1972). (Joslyn I). Joslyn owned a large block of stock in a closely held corporation. The Government, in computing the value of the stock for estate purposes, made allowance for “blockage” elements.[5] Subsequently it was necessary to sell the stock through a registered secondary offering. The estate paid the expenses of the registration and offering, as well as a commission or discount to the underwriters. The deduction claimed for the expenses and discount was disallowed.
The Tax Court viewed- the deduction as an attempt by the taxpayer “to reduce the net estate subject to taxation twice by reason of the same selling expenses. . . . ” 57 T.C. at 726. Since the value of the stock for gross estate purposes under section 2031 had already been reduced by the underwriters’ discount and other sale related expenses, “the same expenses are not also deductible under section 2053(a)”. 57 T.C. at 727.
The Ninth Circuit reversed. In re Estate of Joslyn, 500 F.2d 382 (9 Cir. 1974). The court viewed the valuation of the stock under section 2031 and the deduction under section 2053(a) ■ as separate and distinct. The court found that the “blockage” factor was simply a matter of valuation that the estate would be entitled to “regardless of whether or not the stock is subsequently sold.” Id. at 384. The court concluded that the expenses and underwriters’ discount incurred in a subsequent sale would not be an improper “double deduction”.[6]
*1104 Although the Ninth Circuit reversed the judgment of the Tax Court, it did not expressly approve the deductions, concluding that a dispute still existed as to whether the particular deductions claimed were within the purview of section 2053. Accordingly, the court remanded to the Tax Court for further consideration.
Upon remand the Tax Court approved the deductions for the incidental expenses of the sale but rejected the deduction for the underwriters’ discount. The court found that the firm commitment “underwriting agreement was by its term a sale”. Joslyn II, 63 T.C. at 483. The court rejected the taxpayer’s argument that the underwriters were “mere agents” or “conduits” through which the stock was transferred to the public. Id. at 484. Finding that “there was in substance, as well as form, a sale to the underwriters,” the court concluded that “[t]he underwriters’ subsequent profit is not a deductible cost of administration”. Id. at 485.
In again reversing the Tax Court in Jos-lyn II, the Ninth Circuit viewed the underwriters’ role as a necessary conduit for the public sale of the stock. The public secondary offering of the stock generated a certain amount of proceeds. From those proceeds the underwriters took a commission or discount and then paid the remainder to the estate. “For their services to the estate, [the underwriters] charged that amount, it was paid, and the probate court of the State of California approved it.” 566 F.2d at 678. There was an “appearance of duplication” only because of the “timing” of the IRS audit and the method employed in making the blockage adjustment. The court concluded that however the underwriters’ discount or commission may be termed, “it is in substance the charge which [the underwriters] made to sell” the stock. Id. at 679. Thus it was deductible under section 2053(a).

The Underwriters’ Discount

As in Joslyn, the executor here sold a large block of stock by way of a registered secondary offering.[7] Faced with the need to raise a substantial amount of cash, the executor decided to sell the majority of the estate’s holdings of B-F stock. The only viable method of accomplishing that sale was through a registered secondary offering. In order to do that the estate had to pay not only the legal and other incidental expenses of registration but also a 7.5% commission to the underwriters.
Prior to this public offering, B-F stock was publicly traded at approximately $42.00 per share. The underwriters sold all of the 300,000 shares at that price, for a total of $12,600,000. The estate did not realize that amount, however, because it'had to pay the underwriters’ charge for the public placement of the stock. The estate could have received more if it had not been necessary to engage the services, of an underwriter to market the stock, but because of the nature and quantity of the stock that was not possible. The estate bore the entire expense of publicly marketing the stock. It should receive the benefit of a deduction for the reduction in net proceeds resulting from the payment of the costs of the sale, including the underwriters’ commission. As the Ninth Circuit noted, the “deductibility of underwriting expense in the sale of securities to meet debts and obligations of the estate has been sustained directly or by analogy before. Estate of Park v. Commissioner, 475 F.2d 673 (6th Cir. 1973); Estate of Henry E. Huntington, 36 B.T.A. 698, 726 (1937).” 566 F.2d at 678. Cf. Clapp v. United States, 70-2 U.S.T.C. 1 12,720 (1970).
The Commissioner argues that under the terms of the firm commitment agreement the estate simply sold the stock outright and all risk passed to the underwriters. *1105 The same argument was rejected by the Ninth Circuit in Joslyn and we reject it here. By the terms of the agreement, the underwriters could unilaterally terminate the sale if certain enumerated contingencies occurred.[8] And the underwriting practice of placing the stock prior to execution of the agreement suggests that the underwriters, in practical terms, bore little actual risk.[9]
Moreover, in our opinion it would be inconsistent to deny the deduction for offerings made pursuant to a firm commitment underwriting while allowing a deduction, as the IRS apparently would, for offerings made pursuant to a best efforts underwriting.[10] While there are differences in the respective roles of the selling stockholder and the underwriter under these two types of agreements, making such a legal distinction with respect to the availability of the deduction would arbitrarily penalize those stockholders whose stock is valuable enough to be able to elicit a firm commitment from the underwriter, even though the stockholders are otherwise precluded from selling the stock themselves.
Finally, we would note that, notwithstanding the ostensible terms of the agreement, SEC regulations prohibit underwriters from purchasing stock for their own accounts. 17 C.F.R. § 240.10b-6. Characterization of this transaction as a sale to the underwriters would therefore conflict with the duties and obligations of underwriters under the SEC.[11]

Deductibility

Section 2053(a) requires that administrative expenses must be “allowable by the laws of the jurisdiction . . . under which the estate is being administered”. IRS regulations require that deductible administrative expenses under section 2053(a)(2) must be “necessarily, incurred in the administration of the decedent’s estate”. Treas.Reg. § 20.2053-3(a). Expenses of selling property qualify for deduction if the sale is “necessary in order to pay the decedent’s debts, expenses of administration, or taxes, to preserve the estate, or to effect distribution”. Treas.Reg. § 20,-2053-3(d)(2).[12]
The record reflects that the estate was confronted with approximately $10,000,000 in claims; taxes, and administration expenses before the IRS made its deficiency assessment. That assessment added another $3,661,955.31 to the potential claims. The estate held only $2,800,000 in marketable securities and cash prior to the sale of the B-F stock. It was necessary therefore for the executor to sell a substantial portion of the estate’s shares of B-F stock. After selling 300,000 of the 319,347 shares, the executor submitted an accounting to the Probate Division of the Cook County Circuit Court. That accounting included receipt of $12,600,000 on the sale of the 300,000 shares *1106 and disbursement of $945,000 to the underwriters as “Payment of underwriting discount.” The probate court approved the accounting, including both the underwriters’ discount and the other incidental expenses, on May 1, 1973. Because Illinois laws — “the laws of the jurisdiction . under which the estate is being administered” — only permit executors to sell estate assets “when it is necessary for the proper administration of the estate,” Ill.Ann.Stat. ch. 3, § 209 (Smith-Hurd), the probate court’s approval of the account constitutes an implicit finding of the “necessity” of the sale.
The Commissioner contends, however, that if this court decides that the underwriting expenses are deductible under section 2053, the case should be remanded to the Tax Court for a determination as to how much of the underwriting discount is deductible. It is true that the Tax Court did not make a specific finding as to how many shares actually had to be sold for proper administration of the estate. Accordingly, it is argued that the case should be returned to that court so that it can decide how much of the secondary offering was reasonably necessary to meet the needs of the estate and therefore how much of the discount was in fact a necessary expense of administration.
As a general rule the decree of a probate court approving expenditures as proper administrative expenses under state law will control. This court held in Ballance v. Commissioner, 347 F.2d 419, 423 (7 Cir. 1965), that to ascertain whether a particular expenditure “constitutes an allowable expense of administration” “recourse must be had to [state] law”. The court concluded further that a state probate court’s allowance of an expenditure constitutes a recognition by that court that it is an allowable administrative expense under the “laws of the jurisdiction”.
The Sixth Circuit has also concluded that the deductibility of the expense is governed by state law alone. Estate of Park v. Commissioner, 475 F.2d 673, 676 (6 Cir. 1973). The court found that “[b]y the literal language of § 2053(a), Congress has left the deductibility of administrative expenses to be governed by their chargeability against the assets of the estate under state law”. The court concluded that since the expenses there were allowable under state law and twice approved in accountings to the state court they were deductible under section 2053(a).[13]
The executor argues that the Tax Court did rule upon the “necessity” of the expense, so no remand is warranted. It relies upon the court’s statements in its “Findings of Fact” that “[i]n order to raise between 5.8 and 8.8 million dollars needed to satisfy debts, taxes, and administrative expenses, the executor decided to sell some of the estate’s B-F stock”, and that the executor’s account was approved and the disbursements approved by the court included the underwriting discount of $945,000. The opinion of the court recites that the executor entered into the' underwriting agreement “to obtain sufficient money to properly administer decedent’s estate”. The court also stated: “Since the only expense still in contention in the case before us is an underwriting discount, we rely only on our second Joslyn opinion to disallow the deduction for underwriting discount”.
While we cannot entirely agree with the executor’s interpretation of the Tax Court decision, we do find there is ample evidence in the record to support the state probate court’s implicit finding that under Illinois *1107 law the sale of the block of 300,000 shares was reasonably necessary for the beneficial administration of the estate. We do not find it necessary therefore to remand to the Tax Court for further consideration of this limited factual issue.

Conclusion

We reverse the decision of the Tax Court and hold that the full amount paid by the estate to the underwriters as a commission or discount for their services in the public marketing of B-F stock is a deductible administrative expense under section 2053(a)(2).

. Section 2053(a)(2) provides in part:
(a) General Rule. — For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—
(2) for administration expenses,
as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.

. An officer of the executor testified that he was advised that under SEC rules because the estate owned 11% of the outstanding B-F stock it would be required to register any sale.

. Under a “firm commitment” agreement the underwriter agrees to purchase a specific amount of stock for a fixed price at a certain time. In contrast, under a “best efforts” agreement the underwriter sells the stock for the stockholder as an agent and only agrees to use its best efforts in obtaining sales.

. The registration statement indicates that on the day preceding, May 10, 1972, the high bid quotation for B-F stock was $42.50. It also indicates that bid quotations had ranged as high as $53 and as low as $37 in the year preceding.

. Treasury Regulation section 20.2031-2 provides in pertinent part:
(b) . . . If there is a market for stocks or bonds on a stock exchange, in an over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share or bond.
(e) . . . If it is established that the value of any bond or share of stock determined on the basis of selling or bid and asked prices . . . does not reflect the fair market value thereof, then some reasonable modification of that basis or other relevant facts and elements of value are considered in determining the fair market value . . . . In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued.

. Because the gross estate value under section 2031 was computed by the IRS after the stock had been sold, the IRS was able to make the blockage adjustment through what the court described as the “fortuitous use of hindsight” by reducing the fair market value by the exact amount it cost the estate to make the sale. Id. at 384.

. If there is any distinction between this case and Joslyn it is the absence here of even the appearance of a double deduction. In its valuation of the B-F and CFC stock held by the decedent for purposes of section 2031, the Tax Court did consider blockage, but that was but one factor in its detailed and comprehensive examination of the value of those stocks. It did not, as in Joslyn, use the exact figures for the cost of sale through an underwriter. Thus the case for allowing the deduction is even stronger here.

. The Commissioner acknowledged that the agreement was “subject to certain conditions precedent” and “if there was any significant change in the market value of any of the ten major holdings of BF prior to the effective date, the underwriters could get out of their obligation”.

. The executor submits that “neither the registration statement nor the underwriting agreement was executed until the sale to the public was a certainty”. Moreover “[i]n fact and substance, if the sale to the public had not been arranged on or before May 12, 1972, the underwriting syndicate would have deferred the registration and the execution of the underwriting agreement.” The Commissioner failed to contest these assertions. •

. See note 3, supra.

. It seems unlikely that the underwriters would agree to an outright purchase of B-F stock in the face of this prohibition in Rule 10b-6.

. Since Illinois law also requires that a sale of estate assets be “necessary”, we do not need to address the question of whether the “necessity” requirements of Treasury Regulations §§ 20.2053-3(a) and 3(d)(2) improperly add to or override the requirement in the Code that administration expenses need only be “allowable by the laws of the jurisdiction . . . .” 26 U.S.C. § 2053(a)(2). Compare Ballance v. United States, 347 F.2d 419, 423 (7 Cir. 1965); Estate of Park v. Commissioner, 475 F.2d 673, 676 (6 Cir. 1973) with Estate of Smith v. Commissioner, 510 F.2d 479 (2 Cir.), cert. denied 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975).

. On the other hand, in Estate of Smith, 510 F.2d at 482-83, the court held that under certain circumstances, “the federal courts cannot be precluded from reexamining a lower state court’s allowance of administrative expenses to determine whether they were in fact necessary to carry out the administration of the estate . .” One judge dissented, quoting from Estate of Park, supra, and citing Ballance, supra, in support of his conclusion that the Code “unambiguously provides” for the deduction of expenses “allowed by the jurisdiction administering the estate and neither the Commissioner of Internal Revenue nor the Tax Court . can properly reverse the State Court determination”. 510 F.2d at 483 (Mulligan, J., dissenting).