STATE of Iowa, Appellee,

v.

Michael Cecil CRANEY, Appellant.

No. 69614.

Supreme Court of Iowa.

April 11, 1984.

Rehearing Denied May 10, 1984.

James F. Whalen of Dunbar, Dunbar & Whalen, Waterloo, for appellant.

Thomas J. Miller, Atty. Gen., Roxann M. Ryan, Asst. Atty. Gen. and Philip E. Havens, County Atty., for appellee.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, LARSON, and CARTER, JJ.

UHLENHOPP, Justice.

This appeal involves legal issues which arose in a first-degree murder prosecution.

The jury could find the facts as follows. At the time of the incident in question defendant Michael Cecil Craney and his wife Kimberly had a fifteen-day-old child, Matthew. Previously defendant had un-

dergone periods of depression and delusions and had abused alcohol and drugs. The day before the incident he worked on his brother's farm. That evening he complained of tiredness and "felt like his brain was fried." His wife, thinking he was going to destroy their record collection for religious reasons, told him if he did so she would leave him. Defendant complained that he had never done anything right in his life. He picked up the baby, who apparently struck him on the cheek. He said the baby also knew how bad and low he was.

After defendant and Kimberly went to bed defendant talked of demons and fires. About 10:30 p.m. he went out into the rain and uttered a "terrible scream." Back in the house, he said he had to get his brother's forgiveness.

Defendant then drove to his brother on a farm, and begged forgiveness. His two brothers drove to town with him to get sleeping medicine, but defendant refused to enter the convenience store because it sold pornography. Defendant then went home.

Defendant told his wife he was "possessed", and about midnight got up with her for the child-feeding. He "sort of stared." At the feeding about 5:30 a.m., Kimberly told defendant she thought she would take the baby away for a day to rest. Defendant implored her not to go until his fever broke, yet he did not appear to have a fever. He also said he thought the baby was possessed. Kimberly assured him she would not leave.

At about 6:30 a.m. defendant got up, went into the baby's room, and, according to Kimberly:

Q. And what is the next thing that you saw or heard? A. I heard gurgling noises and I saw Mike in the baby's room walking around, and then I heard gurgling noises and I got up and I went into the room. And he had the baby out of the bed and one hand was behind the baby's neck and one hand was on his face.

Q. Then did you say or do anything at that time? A. I tried to get the baby. I

asked him what he was doing or something to that effect. And I couldn't get him away from him and we wrestled to the floor, and I was still trying to get a hold of him and get Mike's hand off him, and I couldn't. He had his hand on his throat and I couldn't get him away, so I went down and called the police.

Q. Now, at the time that you were upstairs in the baby's room were you screaming at Mike? A. Probably.

Q. While you were on the telephone calling the police did you see Mike and the baby again? A. Yes. He brought him downstairs.

Q. How did he have a hold of him when he brought him downstairs? A. With his two hands around his neck.

Q. Did he hold him out of front of him? A. Yes.

Q. And when he brought him downstairs were you still on the telephone? A. Yes.

Q. Where is the telephone located at your house? A. On the left side of the counter in the dining room.

Q. And I think you've indicated before that the kitchen and dining room are close together, they are adjacent to one another? A. Yes, they are separated by a bar.

Q. And after Michael brought the baby downstairs, I think you indicated that he came to the dining room; is that correct? A. Yes.

Q. And he— A. He went around the counter, the other side of the counter opposite of where I was, and went to the drawer where I keep my cooking utensils and knives. And I was screaming over the phone at the police person and I got around to the drawer, and he was trying to get a knife, and I was trying to keep it closed. And he jerked it open and grabbed the knife out. Then he turned around and slammed the baby to the floor, and then I started hitting him on the head with the phone and screaming at him and trying to grab the knife away.

Q. At the time that you mentioned that you tried to grab the baby—tried to

grab the knife away, was Mike stabbing your baby? A. Yes.

Q. After you saw Mike stab the baby, did he leave? A. Yes. He threw the knife down and ran back around the other side of the counter where he came from before, and I told him to get out and to look what he had done to our baby. And I told him not to take the keys to the car. He grabbed the extra set of keys off the key hook.

The child sustained numerous stab wounds, a fractured skull, and a slit throat, and died.

The county attorney charged defendant with premeditated first-degree murder. A jury found him guilty, the trial court sentenced him to life imprisonment, and he appealed.

I. *Sannito testimony.* Thomas Sannito holds the degree of doctor of philosophy in psychology. After officers took defendant into custody, defendant asked to see Steven K. Ristvedt, a local attorney. Ristvedt called in Sannito to examine defendant on the question of sanity. Sannito examined defendant, and defendant gave Sannito background information and admitted that he killed the child. Sannito concluded that defendant was sane at the time of the act but that a basis existed for the defense of diminished responsibility. Ristvedt so informed the county attorney. *See Iowa R. Crim. P.* 10(11)(*b*)(2), 13(2)(*b*)(2), and 13(3)(*b*) (reciprocal discovery). Initially the district court denied payment of Sannito's fee from public funds, but about two months later the court allowed payment.

Defendant gave notice of the defenses of insanity and diminished responsibility. In its case in chief at trial, the State introduced lay testimony in support of sanity, and also called Sannito as a witness. Sannito testified fully as to defendant's statements to him in the previous examination, including defendant's incriminating admissions of committing the homicide. In addition, Sannito opined that defendant was sane but had diminished capacity. On the mental issue, defendant introduced lay testimony in his evidence in chief at trial and

also the testimony of Ristvedt, two psychiatrists, and another psychologist.

Defendant objected on three grounds before and during trial to the State's introduction of Sannito's testimony: violation of his privilege against self-incrimination under the fifth and fourteenth amendments to the United States Constitution; violation of his right to effective assistance of counsel under the sixth and fourteenth amendments; and violation of the Iowa statutory attorney-client privilege.

Involved here is the question of the admissibility of testimony of an expert who, in connection with pending or impending litigation, examines a defendant for the purpose of making a report or giving testimony regarding the defendant's mental condition.

A. We must first decide whether the trial court erred under the fifth and fourteenth amendments in admitting all or part of the Sannito testimony and, if so, we must further decide upon the disposition we should make of the appeal.

1. This court has grappled with some aspects of the admissibility of testimony of the kind at hand. The court has held that the doctor-patient privilege does not arise in situations of the present kind because the purpose of the consultation was not diagnosis and treatment of the defendant. *State v. Mayhew,* 170 N.W.2d 608, 615–16 (Iowa 1969). We have also held that the *Miranda* requirement is inapplicable. *State v. Collins,* 236 N.W.2d 376, 378 (Iowa 1975), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976). *See also Weaver v. Gill,* 633 F.2d 737 (6th Cir.1980) (*per curiam*). The expert's conclusion of sanity or insanity in his report is not within the attorney-client privilege because intended confidentiality is lacking. *State v. Tensley,* 249 N.W.2d 659, 661–62 (Iowa 1977). We were not required to decide in *Tensley* whether the defendant's detailed statements to the psychiatrist were initially within the privilege because we held, on the basis of waiver, that the State could cross-examine regarding those

statements after the expert testified as to favorable aspects of them.

We recently held that a doctor cannot establish the confidentiality requirement with a patient, giving rise to the doctor-patient privilege, when the examination is under a court order; and that in addition a defendant waives the doctor-patient privilege when he gives notice of the defense of insanity or diminished responsibility. *State v. Cole*, 295 N.W.2d 29, 33–35 (Iowa 1980). In *Cole* we also pointed out, "We have not addressed the possible constitutional implications in a forced disclosure of doctor-patient communications, which have not been raised. Issues of constitutional proportion might arise, for example, if a patient's record, including details of the current or prior crimes, is sought to be used by the prosecution in its case in chief.... A defendant's fifth-amendment rights would obviously be involved.... We point out these constitutional issues to contrast them to the statutory privilege with which we are dealing in this case and to establish parameters of the waiver rule announced herein. The constitutional issues must remain to be resolved as they arise." *Id.* at 36.

Finally, we had the admissibility question in the context of postconviction proceedings in *Snethen v. State*, 308 N.W.2d 11 (Iowa 1981). Snethen challenged the competency of the attorney who served him at the criminal trial. He claimed inter alia that the attorney did not object to testimony by the expert at that trial as to conversations and statements by the defendant, contrary to *Collins v. Auger*, 577 F.2d 1107 (8th Cir.1978), *cert. denied*, 439 U.S. 1133, 99 S.Ct. 1057, 59 L.Ed.2d 96 (1979). We held however that as *Collins v. Auger* had not been decided at the time of Snethen's criminal trial, the defense attorney could not be held to the standard of a "crystal gazer" and incompetency of counsel did not appear. *Snethen v. State*, 308 N.W.2d at 16.

The present case requires us to deal with the constitutional implications pointed up in *Cole*. After we decided the *Collins* case,

Collins pursued habeas corpus proceedings in the federal courts. The result as to petitioner Collins himself, so far as we are now concerned, is revealed by the following from *Collins v. Auger*, 577 F.2d at 1109–10:

Since we find petitioner made a sufficient objection, he is entitled to review of his constitutional claims on the merits. The district court found that admission of the statements to Dr. Lara violated petitioner's due process rights:

"[I]t is fundamentally unfair to use defendant's incriminating admissions to a psychiatrist during a psychiatric examination as part of the prosecution's case to establish his guilt.

"The defendant is entitled to raise his mental condition at the time of the offense as a defense. He is also entitled, under proper circumstances, to an examination to determine his competency to stand trial. Psychiatric examinations are essential to the proof of his mental condition. An indigent must seek a court order authorizing the examination and payment of its cost. If the giving of a *Miranda* warning satisfied requirements of the Fifth Amendment and the Fourteenth Amendment and made the defendant's incriminating admissions admissible, the defendant would be placed in a situation where he must sacrifice one Constitutional right to claim another.

"If a defendant cooperated with the psychiatrist and made a full disclosure of his thinking processes and his background, including incriminating statements and if he failed to establish his lack of mental capacity, he would be faced with these admissions on trial. If a defendant exercised his right to remain silent and refused to cooperate with the psychiatrist the likelihood of a meaningful and reliable examination would be considerably decreased and his opportunity to urge a possible defense thwarted. A defendant should not be compelled to choose between exercising his Fifth Amendment right

not to incriminate himself and his due process right to seek out available defenses."

*Collins v. Auger,* 428 F.Supp. 1079, 1082–83 (S.D.Iowa 1977).

[W]e agree with this reasoning....

■ Although opinions adopting various views can be found on the question of the admissibility of the testimony of an expert who examines or evaluates a defendant in connection with pending or impending litigation, we are persuaded the better view is that a distinction should be drawn between testimony by the expert (a) which on the one hand gives (i) his opinion on sanity or insanity and (ii) his non-incriminatory observations in arriving at his opinion including non-incriminatory statements by the defendant, and (b) which on the other hand gives his incriminatory observations in arriving at his opinion including incriminatory statements by the defendant. Opinions, observations, and statements under branch (a) are admissible, but observations and statements under branch (b) are inadmissible. Under these principles, an observation or statement is not "incriminatory" merely because it tends to show the defendant is sane.

The privilege against self-incrimination and the right to fundamental fairness under the due process clause tend to blend on this question, and we are satisfied in this case, as the federal court was in *Collins,* that defendant Craney raised and preserved those constitutional protections at his trial. We are also satisfied that the better-reasoned decisions support the non-incriminatory-incriminatory distinction we have drawn. *Noggle v. Marshall,* 706 F.2d 1408, 1416 (6th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 530, 78 L.Ed.2d 712 (1983) ("Evidence of a defendant's inculpatory statements during a psychiatric examination cannot be admitted to prove guilt."); *Gibson v. Zahradnick,* 581 F.2d 75, 78 (4th Cir.), *cert. denied sub nom. Mitchell v. Gibson,* 439 U.S. 996, 99 S.Ct. 597, 58 L.Ed.2d 669 (1978); *United States v. Cohen,* 530 F.2d 43, 48 (5th Cir.), *cert. denied,* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976) ("To hold that compelled psychiatric examinations are forbidden because sanity is an element of the offense and that the privilege against self-incrimination prohibits compulsory elicitation of statements going to an element of the offense would be confining ourselves within an analytical prison. Given the defendant's power to have any incriminating factual statements resulting from the examination suppressed, we think the proper analogy is the required furnishing of handwriting exemplars by the defendant and similar procedures."); *United States v. Williams,* 456 F.2d 217, 218 (5th Cir.1972) (per curiam) ("No inculpatory statements of the defendant to his examiner are admissible in evidence."); *United States v. Bohle,* 445 F.2d 54, 66–67 (7th Cir.1971) ("Such an examination does not violate the Fifth Amendment privilege, because its sole purpose is to enable an expert to form an opinion as to defendant's mental capacity to form a criminal intent. It is not intended to aid in the establishment of facts showing that defendant committed certain acts constituting a crime. It cannot be so used, for it is impermissible to introduce into evidence on the issue of guilt any statement made by the defendant during the course of such an examination. We note that in this case the trial court specifically ruled that 'any testimony predicated solely upon this evaluation will go solely on the issue of insanity or sanity, and no other issue in the case.' The rights of the defendant are fully protected by this exclusionary rule.").

The case at bar is not controlled by *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). There the Court held fundamentally unfair the admission of evidence, which was obtained in a pretrial competency hearing, at a subsequent punishment phase of the criminal case. We have no such situation here with respect to Sannito.

■ In the present case the trial court did not err, insofar as the fifth and fourteenth amendments are concerned, in admitting Sannito's opinion on sanity and diminished responsibility and his non-incrimi-

natory observations of defendant including statements by defendant; but the court erred in admitting Sannito's testimony as to defendant's incriminatory admissions of killing the child.

2. What disposition should we make of the appeal in light of the admission of the part of the Sannito testimony relating to commission of the homicide? We first note that ostensible error in admitting such testimony may not actually be error under a given record. A defendant might, in a legally appropriate way prior to or at trial and before the expert is called to the stand by the State, concede that he committed the homicide and rest altogether on an insanity defense. Then a trial court could permit the State to interrogate the expert about defendant's statements that he killed the victim; that evidence would not have the effect of incriminating the defendant because the defendant had already conceded he killed the victim.

That scenario may in fact be what we have here. When Sannito was placed on the stand in the State's case-in-chief, a hearing was held in chambers and the defense interposed the objections which we have recited. In ruling on the objections the trial court stated in part:

> [A]nd I am also satisfied that from the statements of defense counsel in voir dire, from the totality of the evidence that has been presented, there really is no question of whether or not the Defendant committed the act and so any statements by Dr. Sannito of admissions by the Defendant to that fact, even if a violation of the Defendant's right against self-incrimination, is abundantly made harmless error by the overwhelming evidence and apparently no evidence to the contrary that the Defendant committed the act that he is alleged to have committed.

Defense counsel may have stated in voir dire of prospective jurors or in opening statement that defendant conceded he killed the child. The problem is that we have not been provided with the record of the voir dire or opening statements. On the record we do have we cannot speculate that defendant conceded he killed the child. We thus turn to the question of whether, holding error occurred in the admission of Sannito's testimony that defendant stated he killed the child, the error caused defendant harm.

The question of prejudice from admission of similar incriminating statements was involved in *United States v. Albright*, 388 F.2d 719 (4th Cir.1968). The prosecutor's expert related admissions by the defendant of committing the acts charged which "would have violated defendant's privilege against self-incrimination...." *Id.* at 726. During trial the trial court stated to the jury that the defendant admitted the acts and defended on the ground of insanity. The defendant's witness, a psychiatrist, disclosed on examination that the defendant committed the acts, and questions on direct and cross-examination included assumptions that the defendant committed the acts. The court of appeals stated, "It thus appears that defendant agreed to the court's statement that he no longer contested doing the acts charged against him...." That court then held the testimony by the prosecution's expert was harmless. *Id.* at 725–26.

The procedure here was somewhat different but it leads to the same result. The trial court erroneously admitted defendant's incriminating statements to Sannito. But aside from the Sannito testimony the State's evidence showing that defendant killed the child was overwhelming. Defendant's wife as a State's witness detailed the entire incident. A pathologist fully described the child's injuries and the cause of death. A deputy sheriff described the crime scene and the knife which was found there. Defendant's two brothers each testified defendant came to them and stated, "You better call the cops, I just killed that baby."

On the other side of the case, defendant's first witness at trial was Attorney Ristvedt, who originally represented defendant. Ristvedt testified for the defense on direct examination:

Q. Mike [defendant] told you that she had indicated that she was going to leave him? A. Yes. That he was sure that that was the work of the infant to escape from him, and that this would be his only chance in which to kill the infant. He had been hearing these noises most of the night preceding the incident. He had gotten up that morning. His wife was already up and was feeding the infant, breastfeeding the infant. He proceeded into the infant's bedroom, took the infant away from his wife, and cradling it in his arms, like this with the head down in the hand of the arm, and attempted to smother the infant with his hand which was unsuccessful.

Q. Did he indicate to you why he felt that he was unsuccessful in suffocating the infant? A. Yes. The infant was struggling too much. It was possessing uncanny supernatural strength. It was kicking him in the chest, thumping at him in the chest, sneering at him, gurgling, laughing at him.

Q. And did he say what he proceeded to do when he could not suffocate the infant? A. He felt the only way that he could kill the infant was to stab it.

Q. And did he tell you what actions he undertook to stab the infant? A. Yes, he did.

Q. What did he tell you? A. He proceeded down to the kitchen area, still carrying the infant, placed the infant on a table, and removed a knife from one of the drawers or picked it up off the counter.

Q. And did he tell you how many times he stabbed the infant? A. He didn't specify. He indicated that he attempted to stab it several times.

Q. And did he say what happened when he attempted to stab the infant? A. That the infant made itself rock hard to the extent that the knife would not penetrate and, in fact, the knife bent and once again the infant was laughing at him.

Q. Did he indicate what his reaction was when the infant puffed itself up and made itself hard? A. Because he could not penetrate the chest area or body of the infant, he then felt his only recourse was to slit the infant's throat.

Q. Did he indicate to you what he did after the infant's throat was slit? A. Well, he did proceed to slice the infant's throat and stood there while the blood was draining from the body to make sure the infant was dead.

Defendant called Vernon Varner as his first psychiatric witness. Dr. Varner testified on direct examination regarding an interview with defendant:

Kim as Mike relates it said I am going to leave you. Kim in her deposition said she never said any such thing. Mike reasoned that she was going to leave him. He then decided that he needed to go over and say goodbye to the baby, went over and picked the baby up and was cuddling the baby and the baby made what Mike referred to as demonic faces, taunting him. In reality I think the baby was making sucking motions. Mike thought that the baby's ears were abnormal, pointed with abnormal ear flaps. And in an instant he knew that he had to kill the baby because the baby was possessed. And Mike told me when he was up—when I was up here in Buchanan County Jail that the baby was, in fact, the son of the devil. It sounds bizarre, but that is what Mike said several times. He then put his hand over the baby's mouth. At the same instant that he decided that, Kim heard the baby struggling and came into the room and struggled with Mike. Mike held onto the baby, Kim fell to the floor and Mike went down to the kitchen. They struggled in the kitchen and Mike banged the baby's head on the floor. He put the baby on a counter and took out a knife and was stabbing the baby in the chest. He thought that the baby had unreal powers to be warding off the knife. The baby was puffing up his chest and preventing the knife from puncturing the baby's chest. He then cut the baby's neck as Mike said and immediately after he cut

the baby's neck, he stopped to walk out of the room.

Defendant called Frank Gersch, who holds the degree of doctor of philosophy in psychology. Gersch testified for the defense on direct examination:

Q. Did Mike relate to you that day the events surrounding the killing of Matthew? A. Yes, he did.

Q. And did he tell you about the killing? A. He told me that he thought the baby was the devil, and that if he had not killed it the devil was going to somehow spread its influence on the world and make things evil and cause a lot of evil things to happen in the world from that point on.

Defendant then called Michael J. Taylor as his second psychiatrist. Dr. Taylor testified on direct examination:

Q. Did you ask Mike what his reasons were for killing the child? A. Yes.

Q. What did he tell you? A. He told—he said I thought it was a devilish force. I thought even if I spent the rest of my life in prison there won't be a devilish force unleased on the world. I know it is wrong to kill, but at the time I thought it was something not human, that some force—that some force had taken over it. And then later on in the interview, I asked Mike why he had used both the knife—why he had first strangled the child and then also used the knife. He said I thought it was something supernatural, stronger than normal. I thought it was capable of survival long beyond the point of a normal human. And then I also asked Mike what he thought would have happened if the baby had not been killed, and he said she would take the baby away and I would never see it again and it would do something terribly evil in the world.

From our examination of the entire record we conclude that the error in admitting the inadmissible part of the Sannito testimony was harmless beyond a reasonable doubt. Not only did the State overwhelmingly prove the killing by defendant, the defense itself used evidence of the

homicide by defendant as proof of its only defense: insanity. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, *reh. denied*, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967).

■ B. Defendant argues that Sannito's entire testimony is privileged under the sixth amendment to the United States Constitution. That amendment guarantees an accused effective assistance of counsel, and the due process clause makes the guarantee obligatory on the states. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Some courts hold that "effective" assistance of counsel means counsel who, in cases involving the defendant's mental condition, can have the confidential assistance of experts in that field; the right-to-counsel clause of the sixth amendment cloaks the defendant's communications to the expert with confidentiality in order, so the theory goes, to make the right to counsel effective. The leading case espousing this view is *United States v. Alvarez*, 519 F.2d 1036, 1045–46 (3rd Cir.1975).

Other courts take the opposite view. *Granviel v. Estelle*, 655 F.2d 673 (5th Cir. 1981), *cert. denied*, 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982); *United States v. Carr*, 437 F.2d 662, 663 (D.C.Cir.), *cert. denied*, 401 U.S. 920, 91 S.Ct. 907, 27 L.Ed.2d 823 (1971) ("Where the mental state of an accused is at issue in a criminal case, it is, as the Government asserts in its brief, 'in the interest of public justice' for the trial court to permit 'both the Government and the defendant full access to the reports and conclusions of all psychiatric witnesses' in order to enable the trial court 'to present a complete exploration of the mental state of the accused to the jury.' This is a proposition with which this court is in full accord; and one which overrides the claims founded upon the attorney-client relationship."); *People v. Sorna*, 88 Mich. App. 351, 276 N.W.2d 892 (1979); *State v. Dodis*, 314 N.W.2d 233 (Minn.1982); *Granviel v. Texas*, 552 S.W.2d 107 (Tex.Cr.App. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977).

We think *Alvarez* reflects the bygone philosophy that for an attorney's investigations to be effective they must be shrouded in secrecy. Although we were dealing with a statutory privilege in *State v. Cole*, the policy of openness which we adopted there is applicable here. We stated that "it would be incongrous to allow a party to put a matter in issue and then deny access of the opposing party to relevant information concerning it." We added, "Our modern concept of criminal trials favors full disclosure of facts, within constitutional limitations, on both sides of the table. The 'sporting' theory of justice resulting from concealment and surprise is no longer the rule." *Id.*, 295 N.W.2d at 35. We hold a defendant receives his constitutional protection in this area from the fifth amendment as we have today applied it, and we reject a constitutionalized attorney-client privilege for a defendant's communications to a mental expert, supposedly emanating from the sixth amendment.

■ C. Defendant also contends his communications to Sannito fall within the Iowa statutory attorney-client privilege. If so, we must of course apply the privilege. The General Assembly has provided in the relevant portion of section 622.10 of the Iowa Code (1983):

> A practicing attorney ... or the stenographer or confidential clerk of any such person, who obtains information by reason of the person's employment ... shall not be allowed, in giving testimony, to disclose any confidential communication properly entrusted to the person in the person's professional capacity, and necessary and proper to enable the person to discharge the functions of the person's office according to the usual course of practice or discipline....

We dealt with an aspect of this problem in *State v. Tensley, supra*, 249 N.W.2d 659. As we already pointed out, we there held an expert's conclusion as to the defendant's mental condition is not within the attorney-client privilege because it is not confidential. We were not required to decide whether the attorney-client privilege did or did not apply to the defendant's other communications to the expert for the reason that we found a waiver in any event when the defendant placed the expert on the stand and interrogated him about the defendant's mental condition.

Here we have no corresponding waiver by defendant as to Sannito's testimony on behalf of the State, and we are required to determine whether the attorney-client privilege applies to a defendant's statements to an expert when the expert is called by the State to testify about them—other than incriminating statements with which we have already dealt under the fifth amendment. We hold for two reasons that the statutory attorney-client privilege is inapplicable. First is the policy enunciated in *Cole* favoring a "full disclosure of facts." 295 N.W.2d at 35. Full disclosure of the facts would be stultified if we restricted the doctor-patient privilege under *Cole* but applied the attorney-client privilege instead. Second, the testimony involved here does not come within the language of the privilege statute in two respects. The "practicing attorney ... or the stenographer or confidential clerk of any such person" is not allowed "in giving testimony" to disclose confidential communications. No such person gave testimony here; Sannito gave the testimony. Moreover, the privilege extends to communications "entrusted to the person", that is, to the practicing attorney or his stenographer or confidential clerk. The communications here were not entrusted to such persons, but to Sannito. In addition, for the reasons stated in the decisions we have cited refusing to apply the sixth amendment to the defendant's communications to the expert under the guise of a constitutional attorney-client privilege, we are unwilling to enlarge the language of section 622.10 to cover such communications. We also note commentators' criticisms of extending the attorney-client privilege to communications to persons outside those specified in the privilege statute. Saltzburg, *Communications Falling Within the Attorney-Client Privilege*, 66 Iowa L.Rev. 811, 816 (1981) ("Third

party communications are unprivileged because the attorney-client privilege is not established to give the client an edge over others in litigation. It is not a strategic tool designed to enable a litigant or potential litigant to gain an advantage by keeping evidence to herself rather than sharing it with others."); *see also* Friedenthal, *Discovery and Use of an Adverse Party's Expert Information*, 14 Stan.L.Rev. 455, 463–64 (1962).

We hold that Sannito's testimony was not privileged under section 622.10 of the Code.

II. *Testimony of M.H.I. staff.* Defendant was a patient at the Independence Mental Health Institute for approximately a month in 1979 for abuse of controlled substances. At trial defendant's witness Dr. Varner testified he relied in his evaluation on defendant's discharge report from M.H.I. in 1979. Varner also testified in his diagnosis that he took into account defendant's prior substance abuse and "transient psychotic states," that he diagnosed a major depressive order, and that defendant "has a significant drug and alcohol history that cannot be ignored." Defendant's witness Gersch testified about defendant's hospitalization for drug abuse and that the use of drugs would not cause psychosis but might trigger a psychosis already present. Other defense witnesses testified about defendant's bizarre behavior at the time of prior psychotic episodes. Defendant's evidence tended to disclose a person with a long-term psychotic condition and wove the M.H.I. period into the pattern.

On rebuttal the State, over defendant's objection, introduced testimony by three experts from M.H.I. regarding defendant's behavior when he was in that institution. This evidence tended to show that defendant's conduct was not as bizarre as the defense painted it. More importantly, it showed that the institutionalization was for controlled substance abuse—yet the evidence at trial regarding defendant's blood tests near the time of the homicide showed a complete absence of drugs. Thus the rebuttal evidence tended to cancel or at least reduce the effect the defense desired to create by showing defendant's hospitalization at M.H.I.

We may assume arguendo that the testimony of the three M.H.I. witnesses would otherwise be privileged under the Iowa statute. When the defense sought to capitalize on the M.H.I. hospitalization, it opened the door under the *Tensley* and *Cole* decisions to this testimony on rebuttal.

III. *Communication with counsel.* Shortly after his arrest defendant desired to consult with Attorney Ristvedt, and Ristvedt's office was contacted. When defendant was being booked, Ristvedt called back and talked with defendant, who was in the presence of Officer David Kuhn. In the telephone conversation, with Kuhn present, defendant told Ristvedt, "I killed my baby." On later occasions Ristvedt consulted with defendant confidentially at the jail.

At trial, and over defendant's objection asserting the attorney-client privilege, Kuhn testified to defendant's quoted statement on the telephone. Defendant contends that the trial court erred in admitting this testimony.

Section 804.20 of the Iowa Code provides:

Any peace officer or other person having custody of any person arrested or restrained of his or her liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of his or her family or any attorney of his or her choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney. If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained. If such person is intoxicated, or a person under eighteen years of age, the call may be made by the person having custody. An attorney shall be permitted to see and consult confidentially with such person alone and

in private at the jail or other place of custody without unreasonable delay. A violation of this section shall constitute a simple misdemeanor.

■ In view of the overwhelming evidence by both the prosecution and defense that defendant did kill the child, the admission of this testimony was harmless beyond question. But in any event the court did not err in admitting the evidence. Defendant made the statement in the presence of a third person, the officer, which eliminates the attorney-client privilege. *State v. Mickle*, 199 Iowa 704, 202 N.W. 549 (1925). In addition, the telephone calls which section 804.20 assures to persons in custody are not intended to be confidential as is shown by the provision that they are to be made in the presence of the custodian. They are for the purpose of enabling the person to arrange for a legal consultation and assistance.

By the same token defendant's sixth amendment right to consult with counsel was not denied him by the statute or in this case. When the person makes arrangements with the attorney on the telephone, the attorney may "consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay." That is what occurred here.

Defendant cites · *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). Neither case is pertinent. *Massiah* involved a government agent who surreptitiously infiltrated a relationship, and *Henry* involved the plant of an agent next to the defendant's cell. We do not find merit in defendant's present contention.

IV. *Statement to jailer.* Defendant had been given the Miranda warning by officers' reading and explaining it to him. When contacted Ristvedt stated that he could come to see defendant in about a half hour. The jailer and defendant waited in the booking room for Ristvedt to arrive. Eventually defendant asked the jailer whether "waiting in this room like this was some sort of psychological game to get me to confess." Over defendant's objection, the jailer testified at trial to this statement.

Defendant argues that this testimony amounted to a comment before the jury on defendant's invocation of his fifth and sixth-amendment constitutional rights, which is forbidden. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

■ The State cannot comment on a defendant's invocation of constitutional rights, but we are unable to read defendant's statement in that light. The decisions defendant cites—*State v. Porter*, 283 N.W.2d 351 (Iowa 1979); *State v. Kyseth*, 240 N.W.2d 671 (Iowa 1976); and *State v. Peterson*, 189 N.W.2d 891 (Iowa 1971)—are not analogous. We do not find error.

V. *Irresistible impulse.* In its overhaul of Iowa criminal law, the General Assembly dealt with the defense of insanity in section 701.4 of the Iowa Code:

No person shall be convicted of any crime if at the time such crime is committed the person suffers from such a diseased or deranged condition of the mind so as to render the person incapable of knowing the nature and quality of the act he or she is committing or incapable of distinguishing between right and wrong in relation to that act. Insanity need not exist for any specific length of time before or after the commission of the alleged criminal act.

The section embodies the rule in *M'Naghten's Case*, 10 Cl. & F. 200, 8 Eng.Rep. 718 (1843). *See State v. Thomas*, 219 N.W.2d 3 (Iowa 1974). Under the rule a defendant must be acquitted if from a diseased or deranged mind he is (1) incapable of knowing the nature and quality of the act he or she is committing or (2) is incapable of distinguishing between right and wrong in relation to the act.

The trial court instructed the jury under this statutory definition of insanity. Defendant, however, requested the court to

instruct separately on irresistible impulse as a defense.

The trial court permitted defendant to introduce his evidence on compulsion as part of his evidence on insanity under the alternative M'Naghten elements, and all of that evidence was before the jury. But the trial court refused to instruct on irresistible impulse as a separate defense. Defendant asserts error.

■ Since adoption of the new criminal code the question of irresistible impulse came before us in a different context in *State v. Hamann*, 285 N.W.2d 180 (Iowa 1979). There the record did not contain substantial evidence of irresistible impulse, and we decided the case on that basis. Here however the record does contain such evidence and the question whether irresistible impulse is a separate defense squarely confronts us. The irresistible impulse doctrine has been criticized on a number of grounds and has been rejected by a majority of states. LaFave and Scott, *Criminal Law* § 37, at 284–86 (1972); Perkins, *Criminal Law* 869 (2d ed. 1969).

We think the trial court was right in refusing to submit the doctrine as a separate defense. The new criminal code was the product of much prior research and exhaustive legislative consideration. In adopting the M'Naghten test, without any of the other alternatives and refinements which exist in this area of law, the General Assembly laid down the rule which is to be applied as the test of insanity in criminal prosecutions.

Moreover, irresistible impulse does not help a defendant; it requires an *additional* element. One or both of the M'Naghten elements must exist in any event, and the existence of either of them already requires acquittal. *Hamann,* at 185 ("Consequently the irresistible impulse instruction is limited to situations in which the defendant either was unable to comprehend the nature and consequences of the act or to know that the act was wrong."). If under *M'Naghten* the jury finds that from diseased or deranged mental condition the defendant was unable to comprehend the nature and consequences of the act or to know that the act was wrong, he must be acquitted whether or not irresistible impulse existed. If the jury finds that the defendant was able to comprehend the nature and consequences of the act and knew that the act was wrong, the defense of insanity fails although the defendant acted from irresistible impulse. The entire defense of insanity is thus subsumed under the M'Naghten test embodied in section 701.4. The trial court did not err.

VI. *Sufficiency of evidence.* Defendant presents finally a twofold argument substantial evidence was not introduced that he had the capacity to premeditate and deliberate and that he actually did so.

■ Our decision on these contentions must of course rest on the contents of the record, which we have examined with care. We view the evidence in the light most favorable to the State, and we consider all the evidence and such inferences as may reasonably be drawn from it. *State v. Schrier,* 300 N.W.2d 305, 306 (Iowa 1981); *State v. Robinson,* 288 N.W.2d 337, 340 (Iowa 1980). As the State charged premeditation and deliberation for first-degree murder, it had the burden of establishing the existence of premeditation and deliberation by substantial evidence, but those elements did not have to exist for an extended period of time. *State v. Fryer,* 226 N.W.2d 36, 41 (Iowa 1975). "Substantial" evidence is such evidence as could convince a rational trier of fact beyond a reasonable doubt. *Robinson,* 288 N.W.2d at 39.

■ From our review of the lay and expert testimony we are firmly convinced that the evidence presented a fact question of guilt for the jury to determine, and that the verdict of first-degree murder should stand.

We find no reversible error.

AFFIRMED.