# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 98-2175/2261

_____

Blair Justin Greiman,             *
                                       *

      Appellee/Cross-Appellant,  *

                                       *   Appeals from the United States

v.                             *   District Court for the Northern

                                     *   District of Iowa.

John A. Thalacker, Warden,     *

                                       *

      Appellant/Cross-Appellee.  *

_____

Submitted:  March 8, 1999

Filed:  June 25, 1999

_____

Before McMILLIAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and
SACHS,[1] District Judge.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Blair Justin Greiman was convicted in Iowa state court for the kidnapping and
attempted murder of a young woman and he was sentenced to a term of life
imprisonment.  Although Mr. Greiman was only sixteen years old at the time of these

_____

[1]The Honorable Howard F. Sachs, United States District Judge for the Western
District of Missouri, sitting by designation.

crimes, the juvenile court waived jurisdiction and granted the state's motion to try Mr. Greiman as an adult. At trial, Mr. Greiman's defense was that he was either temporarily insane or lacked the capacity to form the relevant specific intent at the time that he committed these acts.

Mr. Greiman's conviction and sentence were upheld on appeal, see State v. Greiman, 344 N.W.2d 249 (Iowa 1984), and his petition for state postconviction relief was ultimately denied, see Greiman v. State, 471 N.W.2d 811 (Iowa 1991). Mr. Greiman then petitioned for federal habeas relief under 28 U.S.C. § 2254, claiming that he was denied the effective assistance of counsel at the waiver hearing in juvenile court and at trial. The district court granted his petition with respect to the trial claim and denied it with respect to the juvenile court claim. Both parties appeal. We reverse in part and affirm in part.

I.

The state appeals the part of the district court's order granting habeas relief because of alleged ineffective assistance of counsel at trial. We reverse with respect to that issue.

A claim for ineffective assistance of counsel can prevail only if a defendant demonstrates both deficient performance on counsel's part and resulting prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). Counsel's performance is deficient only if it is shown that he or she "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," id., and prejudice is shown only where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.

At trial, the state presented one expert witness, Dr. Romulo Lara, who testified that Mr. Greiman was not insane and did not lack the capacity to form the relevant

specific intent. Mr. Greiman countered with two psychological experts of his own, who were then followed by a rebuttal witness for the state, Dr. Ron Larsen. Mr. Greiman contends that Dr. Larsen was an improper rebuttal witness because the defense was not notified of the state's intention to call him, and that defense counsel therefore acted deficiently by failing to object to Dr. Larsen. Mr. Greiman maintains, further, that his counsel's error prejudiced him because if counsel had objected to Dr. Larsen's testifying, the testimony would have been excluded, thus weakening the state's case sufficiently to create a reasonable probability that Mr. Greiman would have been acquitted. But even if Mr. Greiman's counsel acted unreasonably, a matter that we do not reach, and even if a proper objection would have led to the exclusion of Dr. Larsen's testimony, a matter hardly free from doubt, we believe that no reasonable probability exists that the outcome of the trial would have been different, because a reasonable jury would not have believed Mr. Greiman's insanity and diminished capacity defenses anyway.

As the factual basis for his defenses, Mr. Greiman presented much evidence about his home life: His mother and father were very demanding (always wanting him to do his best) and often "emotionally unavailable," and his father was frequently out of town. Mr. Greiman's doctors also said that his mother often struck him with a horsewhip and that his father gave him conventional spankings. According to Mr. Greiman's psychological experts, these stresses from his home environment combined with concerns at school to create serious psychological problems for Mr. Greiman. As evidence of these problems both experts cited Mr. Greiman's growing preoccupation with ninja and other martial arts, weaponry, and wide open spaces such as Wyoming and Montana. Both experts also testified that Mr. Greiman's mental illness eventually created an irresistible impulse to act violently.

On the day of the crime, Mr. Greiman cut school and went shopping. After entering the K-Mart store where the victim worked and purchasing a music tape, Mr. Greiman returned to his car, which was parked next to the victim's, and waited.

When the victim walked to her car, she gave Mr. Greiman what all witnesses recognized was probably no more than an "innocuous glance." Mr. Greiman, according to his expert witnesses, saw it as much more: He allegedly projected his mother's image onto his innocent victim's face, equating her glance with the disapproving look that his mother often gave him after beatings. This innocent glance then supposedly unleashed years of built-up aggression and hostility that Mr. Greiman was helpless to stop.

One of Mr. Greiman's psychological expert witnesses described this impulse as a "psychotic break" caused by Mr. Greiman's borderline personality disorder, while the other expert testified that, while he was committing his crime, Mr. Greiman suffered from a mixed personality disorder, with paranoid and schizoid traits, and that this disorder made it practically inevitable that Mr. Greiman would eventually fall victim to an irresistible impulse to attack a woman (as a form of retaliation against his abusive mother). After becoming enraged by the victim's glance, the story went, Mr. Greiman forced her into his car, drove to his parents' home, tied and handcuffed the victim, and raped her. He then forced her back into his car and drove to a secluded spot where he stabbed her twice, dumped her into a ditch full of snow, and left her for dead.

The explanations of Mr. Greiman's expert witnesses seem to us highly conjectural and were not supported by any case studies or other evidence that tended to establish their scientific reliability. We therefore do not hesitate to conclude that a jury of reasonable people would have rejected these explanations, even in the absence of Dr. Larsen's testimony. For one thing, Mr. Greiman's insanity defense was at best barely submissible under Iowa law. The rule in Iowa with respect to insanity is the M'Naghten Rule, according to which no person can be convicted of a crime if he or she suffers from a diseased mind that renders him or her incapable of knowing the nature and quality of the act that he or she is committing, or of distinguishing between right and wrong in relation to that act. See Iowa Code Ann. § 701.4; see also, e.g., State v.

-4-

Craney, 347 N.W.2d 668, 679 (Iowa 1984), cert. denied, 469 U.S. 884 (1984), and State v. Hamann, 285 N.W.2d 180, 182 (Iowa 1979) (en banc).

An irresistible impulse to act is not a defense by itself to a criminal charge in the state of Iowa. Craney, 347 N.W.2d at 680; see also Hamann, 285 N.W.2d at 185. Mr. Greiman's insanity defense could have been successful only if the irresistible impulse was caused by a mental illness that destroyed his ability either to distinguish right from wrong or to recognize the nature and quality of his actions. Although both of Mr. Greiman's psychological expert witnesses testified that he had suffered from an irresistible impulse due to mental illness, both admitted that he could distinguish right from wrong and that his ability to recognize the nature and quality of his actions was merely "diminished" or "limited." There was therefore no evidence that Mr. Greiman was incapable of recognizing the nature and quality of his actions.

Mr. Greiman's diminished capacity defense was similarly weak. The testimony in the case, which demonstrated a significant degree of planning and premeditation, furnished much evidence that Mr. Greiman formed a specific intent to commit the crimes charged. Mr. Greiman parked beside the victim's car and sat in wait. When she appeared, he pulled out a gun that was readily available and had been purchased the previous day. He drove her to his parents' home, knowing that no one was there, and quickly gathered up handcuffs, rope, and another firearm. After tying the victim to the bed and raping her, he drove her to a secluded spot, stabbed her, and left her for dead. The only evidence Mr. Greiman offered to negate this evidence of intent consisted of the same speculative and unsubstantiated explanations given by his experts with respect to his insanity defense. We conclude, therefore, that a reasonable jury would have rejected Mr. Greiman's diminished capacity defense, and would have found him guilty of the crimes charged, even if Dr. Larsen had not been allowed to testify.

Mr. Greiman attempts to bolster his claims by noting that Dr. Lara was not a particularly effective witness, and points out that Dr. Lara would have been the state's

only expert witness with respect to Mr. Greiman's sanity and capacity to form the relevant specific intent if Dr. Larsen had not testified. Although Dr. Lara's relative ineffectiveness was acknowledged by the district court, and we defer, as we must, to this factual conclusion, we note that Dr. Lara's findings at least had the advantage of rising above the highly speculative. Dr. Lara testified that, in his expert opinion, Mr. Greiman was not suffering from a diseased mind and that, at the time of the crime, Mr. Greiman understood the nature and quality of his actions, could distinguish right from wrong with respect to those actions, and was capable of forming the relevant specific intent. We believe, despite any flaws in Dr. Lara's expert opinion, that a reasonable jury would have accepted his conclusions over the highly speculative explanations of Mr. Greiman's experts.

Mr. Greiman thus was not prejudiced by his counsel's failure to object to Dr. Larsen's being called as a witness and we therefore reverse the part of the district court's order granting habeas relief because of counsel's alleged errors at trial.

## II.

Mr. Greiman cross-appeals the part of the district court's order denying habeas relief with respect to counsel's performance at the juvenile court waiver hearing. We affirm with respect to that issue.

Mr. Greiman contends that his counsel performed deficiently by failing to present expert testimony to the juvenile court that Mr. Greiman was amenable to successful rehabilitation in the twenty months remaining before his eighteenth birthday (at which time he would have been released if the juvenile court had retained jurisdiction and then convicted him), and that there is a reasonable probability that the juvenile court would not have waived jurisdiction if such evidence had been presented.

Even if defense counsel's performance was deficient, a matter that we do not reach, we believe that Mr. Greiman has failed to demonstrate resulting prejudice.

-6-

Much is made of the juvenile court's remark in its order waiving jurisdiction that "[a] psychological evaluation of Blair may have beneficial [sic] to this Court, but will probably be sought by counsel at a later date." Mr. Greiman offers this statement as evidence of a reasonable probability that, absent his counsel's failure to present expert testimony, the result of that hearing would have been different. We believe that Mr. Greiman overestimates the importance of this remark. We believe that it was a passing comment in an order that was clearly based in the main on the heinous nature of the crimes charged and on the brief period of time remaining before Mr. Greiman would have been released from the juvenile system had he been retained in it.

The impact of the missing testimony, moreover, can be evaluated only in light of what the testimony at the juvenile court waiver hearing would have been had any in fact been offered. Mr. Greiman presented such testimony at his postconviction hearing, and it came from the same two psychological experts who testified for him at trial. Each testified that Mr. Greiman suffered from a mental illness that would have been treatable in the twenty months available. In order to credit the testimony of these witnesses with respect to treatment, however, the juvenile court would have had to credit their testimony with respect to diagnosis. As we indicated above, given what appears to us to be the extreme tenuousness of Mr. Greiman's insanity and diminished capacity defenses, we do not believe that that would have happened. We hold, therefore, that no reasonable probability exists that the result of the juvenile court waiver hearing would have been different if Mr. Greiman's expert witnesses had testified to his amenability to treatment.

## III.

For the reasons stated, we reverse the judgment of the district court with respect to the trial issue and affirm the judgment of the district court with respect to the juvenile court issue.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.